## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THEODORE BARRETT, | : | C.A. No.:  1:14-cv-00742 LPS |
| RONALD KEIS, | : | |
| WILBUR MEDLEY, | : | |
| VICTOR TALMO, | : | |
| RAYMOND BROWN, | : | |
| GENE SCHULTZ, | : | |
| DAVID DEJESUS, | : | |
| DERRICK JACKSON, ~~and~~ | : | JURY TRIAL DEMANDED |
| JOSEPH VINCENT, | : | |
| EMILIANO VAZQUEZ, | : | |
| D'ANDRE ROGERS, | : | |
| ELIU CARRERO, | : | |
| WILLIAM BRAMBLE, | : | |
| EUGENE COX, | : | |
| EARL GARRISON, | : | |
| MARKEZ GARRISON, | : | |
| RUSSELL HURST, | : | |
| ALLEN JOLLY, | : | |
| JOSHUA LEWIS, | : | |
| JAMES WELDIN, | : | |
| KEITH WOOLFORD, and | : | |
| JAKE FOX, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE MCDONALD MD, | : | |
| JILL MOSSER, | : | |
| CORRECT CARE SOLUTIONS, LLC, | : | |
| G.R. JOHNSON, | : | |
| LINDA VALENTINO, | : | |
| LAMONT HAMMOND, | : | |
| MICHAEL SANTINI, | : | |
| DONALD HUTSON, | : | |
| KURT JOHNSON, | : | |
| MICHAEL FABBER, and | : | |
| CONNECTIONS COMMUNITY SUPPORT | : | |
| PROGRAMS, INC. | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

### Introduction

1.      Between 2008 and 2013 Defendant Lawrence McDonald, MD (McDonald), while working for healthcare companies Correctional Medical Services (CMS) and Correct Care Solutions (CCS), pursuant to contracts with the Delaware Department of Correction (DOC), under the pretext of performing medical exams at Sussex Correctional Institution (SCI) and other institutions, repeatedly touched, fondled, and digitally penetrated inmates, including Plaintiffs, against their will, for no legitimate medical reason. He did so to satisfy his own prurient sexual desires and to embarrass, frighten, and humiliate the inmates.

2.      From 2006 through January 2013, other Defendants covered up McDonald's regular ongoing pattern of sexually molesting and abusing inmates and denied inmates the right to file a grievance or other complaint about his behavior. Collectively they:

   a)  Defended McDonald against charges that he was sexually abusing inmates;

   b)  Failed to conduct any significant investigation of McDonald, despite the numerous complaints about his abusive behavior;

   c)  Failed to heed the warning of the correctional staff members who reported McDonald's abuse of inmates;

   d)  Told inmates who attempted to grieve improper behavior by medical or correctional staff that such complaints were not grievable.

   e)  Instead of acting on inmate grievances about McDonald's behavior, Defendants retaliated against inmates who complained about sexual abuse by McDonald;

   f)  Were deliberately indifferent to the ongoing sexual abuse of inmates by McDonald;

g)  Caused correctional staff, medical staff, and inmates to give up filing complaints about McDonald when it became obvious to them that neither DOC nor the medical contractor was going to do anything about his behavior; and

h)  Failed to adhere to the laws, regulations, codes of conduct, contractual obligations and professional duties that required them to fully investigate and report all of the sexual abuse complaints against McDonald.

i)  Allowed the correctional staff to retaliate against, threaten, and abuse inmates who complained about any of the correctional or medical staff including McDonald.

3.      As a result of Dr. McDonald's assaults, from which the other Defendants failed to protect them, his victims have suffered mental, emotional, and physical pain and distress.

4.      Sexual abuse of inmates continues to be a significant nationwide problem. Statistics show that about one-half of the sexual abuse is committed by prison staff. Also, prison administrator reports of sexual abuse are less than one-third of the number reported in prisoner surveys. It seems that inmates who report sexual abuse are often accused of fabrication, and inmates who have been sexually abused often fail to report it. Inmates fear no one will believe them and that they will suffer retaliation from the prison staff if they report being abused.

5.      The Prison Rape Elimination Act (PREA) was passed in 2003 and DOC has acknowledged that PREA applies to all of its institutions, including SCI. PREA is covered in DOC Policy 8.60 and DOC has provided handouts about PREA to correctional staff, however, implementation of PREA has been spotty at best. Each DOC prison is supposed to promptly notify its appointed PREA officer of all alleged sexual misconduct in the prison, including staff sexual misconduct. All staff members are considered mandatory reporters who have no discretion to decide not to report allegations. Complaints of sexual assault are to be kept confidential and only

shared with decision-makers who need the information for investigative purposes. Inmates are supposed to be encouraged to report incidents including non-victimized inmates. Staff members are to handle reports in a timely and detailed manner. The duty to protect against retaliation is supposed to begin immediately and supposedly retaliation of any form will not be tolerated. As stated in the following paragraphs, the defendants have all violated these PREA and DOC standards. Defendants McDonald, Valentino, Mosser, and Hammond continue to violate them.

PARTIES

6.      Theodore Barrett, Plaintiff, is currently an inmate at James T. Vaughn Correctional Center (JTVCC), and was at all times pertinent, an inmate at SCI, in Georgetown Delaware.

7.      Ronald Keis, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown Delaware.

8.      Wilbur Medley, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown Delaware.

9.      Victor Talmo, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware.

10.     Raymond Brown, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware.

11.     Gene Schultz, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware, or Morris Correctional Institute (MCI), in Dover, Delaware.

12.     David DeJesus, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware, or Howard R. Young Correctional Institute (HRYCI), in Wilmington, Delaware.

13.     Derrick Jackson, Plaintiff, was at all times pertinent, an inmate at SCI in Georgetown, Delaware.  He is currently incarcerated at James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware.

14.     Joseph Vincent, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware.

15.     Emiliano Vazquez, Plaintiff, was, at all times pertinent, an inmate at SCI, in Georgetown, Delaware.  He is currently incarcerated at James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware.

16.     D'Andre Rogers, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware.

17.     Eliu Carrero, Plaintiff, is currently, and was at all times pertinent, an inmate at SCI, in Georgetown, Delaware.

18.     William Bramble was at all times pertinent an inmate at SCI in Georgetown, Delaware, or another DOC facility. He is currently not incarcerated, having been released in March 2014.

19.     Eugene Cox, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

20.     Earl Garrison, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

21.     Markez Garrison, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

22.     Russell Hurst, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

23.     Allen Jolly, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

24.     Joshua Lewis, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

25.     James Weldin, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

26.     Keith Woolford, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

27.     Jake Fox, Plaintiff, was at all times pertinent an inmate at SCI in Georgetown, Delaware.

28.     At all times pertinent, McDonald was employed to provide medical services to inmates at SCI and was acting under the color of state law. McDonald moved to Lewes, Delaware, in 2002 to work at the Stokely Center. In 2006 he began working for CMS as Medical Director at SCI. He was not board certified in any medical specialty until he became certified in HIV Medicine in 2008. When CCS took over the contract from CMS on July 1, 2010, McDonald began working for CCS at SCI and at other DOC facilities at Chronic Care Clinics.

29.     At all times pertinent, Jill Mosser, RN, (Mosser) was employed by CMS or CCS, as Health Service Administrator (HSA) at SCI, and at all times pertinent she was acting under the color of state law.

30.     Mosser began working at SCI as a staff nurse for the predecessor to CMS in 2003. CMS returned as the medical provider on July 1, 2005, and Mosser continued to work as a staff nurse until December 2005 when she became the HSA.

31.     As HSA under CMS she was "the Director of Medical and Mental Health Services" for CMS at SCI. Her duties as administrator gave her oversight over all of the medical care providers including McDonald. Mosser and McDonald worked together as part of the leadership team. While McDonald was expected to use his own medical judgment when treating inmates, whether inmates would get the treatment he recommended, especially if it involved treatment outside the institution, was a decision that went through Mosser. As the individual responsible for the entire medical department at SCI, allegations that McDonald was sexually molesting inmates during the course of medical examinations would have come to her from inmates, the medical staff, and the correctional staff. Part of her job as HSA, was to be involved with the medical grievance procedure and therefore was aware of inmate grievances about McDonald. Also, complaints or concerns of the medical staff would ultimately come up through the channels to her if not solved below.

32.     When CCS replaced CMS on July 1, 2010, Mosser continued to work as HSA, or at the equivalent position, for CCS, but because CCS did not get the mental health contract it is possible that only the medical staff complaints would come directly to Mosser. By then however, McDonald's reputation for inappropriate medical exams was well known throughout SCI.

33.     The fact that McDonald and Mosser remained employed at SCI when CCS replaced CMS, is not unusual. The replacement healthcare company usually employs a majority of the employees of the prior company. Thus there were other members of the medical staff who worked at SCI during the entire time that McDonald was there, and they too would have been aware of the allegations against McDonald that were made prior to July 1, 2010.

34.     At all times pertinent, prior to July 1, 2010, CMS was a corporation contracted to the DOC to provide medical services to inmates such as Plaintiffs, but CMS is not a defendant in this case.

35.     At all times since July 1, 2010, Defendant CCS has been a corporation contracted to DOC to provide medical services to inmates such as Plaintiffs.

36.     CMS, CCS, and all of their employees were always obligated by the contract with DOC and by law to provide medical health care to inmates, such as Plaintiffs, that met local community standards AND the standards of the National Commission on Correctional Health (NCCH) and which did not violate Plaintiffs' civil rights.

37.     CCS is legally responsible for all of the actions of its employees and agents that breached community standards or violated inmates' civil rights in the course of providing them health care.

38.     At all times pertinent, Defendant G.R. Johnson (Johnson) was the warden, or deputy warden, security superintendent, a captain or a staff lieutenant at SCI. All grievances at some point in the process would come to him as the warden, or deputy warden or security superintendent at SCI. He would have known from these grievances that allegations were being made that McDonald was sexually assaulting inmates. When he was deputy warden he would attend the "special needs unit meeting" every Wednesday where they would discuss inmates who had specific problems within the institution. It is likely that at some of these meetings the accusations against McDonald would have been discussed.

39.     At all times pertinent, Defendant Linda Valentino (Valentino) was a major, or security superintendent or deputy warden at SCI.  Most grievances at some point in the process would come to her as major, security superintendent or deputy warden at SCI. She would have

known from these grievances that allegations were being made that McDonald was sexually assaulting inmates.

40.    At all times pertinent, Johnson and Valentino were acting under the color of state law, and pursuant to the Eighth Amendment of the United States Constitution, they were obligated to provide Plaintiffs with reasonable medical care for all of their serious medical needs.

41.    Even though DOC contracted with CMS and CCS to provide medical care to inmates such as Plaintiffs, Johnson and Valentino remain subject to a Section 1983 claim because they knew that inmates were not receiving reasonable medical care for their serious medical needs from McDonald and that McDonald would continue his sexual abuse of inmates unless they stopped him.

42.    At all times pertinent, Defendant Lamont Hammond (Hammond) was a correctional officer at SCI and acting under the color of state law.

43.    At all times pertinent, Defendant Michael Santini (Santini) was a correctional officer at SCI and acting under the color of state law.

44.    At all times pertinent, Defendant Donald Hutson (Hutson) was a correctional officer at SCI and acting under the color of state law.

45.    At all times pertinent, Defendant Kurt Johnson (K. Johnson) was a correctional officer at SCI and acting under the color of state law.

46.    At all times pertinent, Defendant Michael Fabber was employed by Defendant Connections Community Support Programs, Inc., as a clerk at SCI. At all times pertinent, he was acting under the color of state law.

47.    Defendant Connections Community Support Programs, Inc. (Connections), is a Delaware non-profit corporation with its principal place of business in Wilmington, Delaware.

From approximately 2012 to June 2014, Connections had a contract with DOC to provide mental health and behavioral health services to inmates in Delaware. Since July 1, 2014, Connections has had a contract with DOC to provide all medical care (except pharmacy services) to inmates in Delaware.

48.     Connections and all of its employees were always obligated by the contract with DOC and by law to provide medical health care to inmates, such as Plaintiffs, that met local community standards AND the standards of the National Commission on Correctional Health (NCCH) and which did not violate Plaintiffs' civil rights.

49.     Connections is legally responsible for all of the actions of its employees and agents that breached community standards or violated inmates' civil rights in the course of providing them health care.

## BACKGROUND

50.     As part of the contractual obligation to DOC to provide medical care in Delaware prisons, CCS provides doctors, nurse practitioners, nurses and other medical staff to DOC institutions, including SCI.

51.     A CCS medical staff member, usually a LPN, initially evaluates all inmates for obvious medical and mental impairments when they arrive at SCI. If an inmate is evaluated and determined to have no serious injury or illness, he is placed into the general population.

52.     When an inmate in general population has a medical or mental health need, he submits the appropriate sick call request form. A nurse reviews the request and often meets with the inmate to determine if the request can be handled without a medical visit with a doctor or nurse practitioner. The nurse puts the names of inmates who need medical visits on the sick call list for

a doctor or nurse practitioner to see them when they next cover sick call. It can take three or four days to get a medical visit, especially over weekends.

53.     If an inmate has a chronic condition, such as an infectious disease, hypertension, or diabetes, he is added to the list for a chronic care clinic and is given regular routine clinic appointments for follow-up of his chronic condition.  Depending on the level of care needed, an inmate can be seen at a chronic care clinic by a nurse, nurse practitioner, or doctor. McDonald routinely treated inmates in chronic care clinics for infectious diseases, as well as covered sick call.

54.     Doctors and nurse practitioners are given a list of inmates to be seen in a clinic or at sick call on the days they are working at SCI. The inmates are called in turn to "medical," but in the case of an obvious urgent need for medical care, inmates not on the list can be taken to medical for treatment.

55.     Medical, or the infirmary, has a number of small rooms with beds for inmates who, for health reasons, should not be in general population. There is an exam area that is not really a separate room but that can be made semi-private by pulling the curtain.

56.     If an inmate is dissatisfied with the medical care given to him, he can request a medical grievance slip from a correctional officer, fill it out and put it in the grievance box. Medical grievances are initially reviewed by one of the employees of the medical care provider. Medical grievances are supposed to be kept confidential, but grievances about a DOC or healthcare employee are routinely leaked to the other employees and inmates in the housing unit. Inmates' medical history and criminal charges are also routinely leaked if an inmate complains. These leaks frequently result in harassment and abuse of the complaining inmate by staff and sometimes other inmates.

57.   DOC has a general grievance system for non-medical issues. However, it is difficult and risky for inmates to file any grievances about a medical or correctional employee.

58.   To file any grievance, an inmate has to ask a correctional officer for a grievance slip, even if it is the very correctional officer about whom they want to file a grievance. The grievance is supposed to be filed within seven days or an inmate can lose the opportunity to grieve the issue. When they file a grievance about a correctional or medical staff member, inmates are often told they cannot grieve the actions of the staff. Also, Correctional Officer John Hammond, and possibly other correctional officers, have been seen "fishing" completed grievances out of the box so they can read them and/or prevent them from going through the grievance process. In other circumstances, grievances are filed and the inmate never hears any response one way or the other about the grievance. Plaintiffs Brown (on an unrelated issue) and Carrero (regarding McDonald) have both submitted grievances that were never addressed at all.

59.   Inmates are often bullied by correctional officers into "signing off" on a resolution to a grievance that does not address their complaint. Correctional officers regularly warn inmates not to file complaints about them or they will make things very difficult for them. If an inmate complains or files grievances about correctional or medical staff, he usually suffers retaliation and abuse from correctional officers for having complained.

60.   Abuse and violence against inmates by correctional staff at SCI is commonplace and, for the most part, unchecked. Inmates at SCI soon become aware that inmates are pepper sprayed and beaten severely by correctional officers at SCI with little or no provocation, especially if the inmates have complained about staff members. Some SCI inmates refer to beatings by correctional officers as "a way of life at SCI." Inmates have reason to fear a beating by the

correctional officers at SCI as they have seen the physical damage to other inmates by such beatings, including recently, a death.

61.     The abusive members of the correctional staff at SCI who routinely provoke inmates and then beat them or attack inmates without any reasonable cause are selective in which inmates they will bully. The chance of being beaten is substantially higher if the inmate is relatively small, relatively old, or suffering from mental or physical illness. The abusive members of the correctional staff at SCI do not provoke large physically fit inmates or physically assault them without reason.

62.     Correctional and medical staff participating in or observing use of force have to file incident reports about it. A watch commander reviews the use of force incident reports but almost always determines that the use of force was justified. Even when excessive use of force is validated by Internal Affairs, little happens to the correctional officer. There are correctional officers who are still working at SCI with more than one documented incident of using excessive force against an inmate. Abused inmates at SCI know they usually have no recourse within the DOC system and consequently abuse frequently goes unreported.

63.     Inmates who try to file a lawsuit about being abused usually cannot get an attorney to represent them, especially if the injuries are not serious and permanent. If they file a suit themselves, the Delaware Attorney General's office defends DOC employees, and attorneys for the medical care providers defend medical employees. Without an attorney to represent them, the courts dismiss most of the suits filed by inmates without any hearing on the merits.

64.     Even though the accusations that McDonald was subjecting inmates to unnecessary rectal exams at almost every visit and was fondling their genitalia without medical justification were well known to members of the correctional and medical staff at SCI, the accusations were

denied or ignored and suppressed by the Defendants. Inmates complaining about the sexual abuse were often harassed, ridiculed or abused.

65.     Inmates have no say about which medical providers treat them, and they may not insist on being taken out of the prison for medical care. Even when they grieve medical care issues, the DOC Bureau Chief is the ultimate authority on grievances in the prison, and inmates are stuck with the decisions made by him. As a result, the Plaintiffs were completely dependent on the medical provider and DOC to keep them protected from sexual abuse by medical care providers.

66.     Inmates sometimes refused sick call visits with McDonald because of his habit of molesting them, but they were still charged the $4.00 medical visit fee. Some of them filed grievances seeking to have the $4.00 charge reversed. Their options at SCI were often to be seen by McDonald and risk sexual abuse or to get no medical care at all.

67.     Many inmates at SCI, including plaintiffs, witnessed inmates who complained about McDonald, being treated as lying or mistaken by prison officials, without their complaints ever being fully investigated. There was no full investigation because defendants violated the laws that required them to promptly report these complaints to the PREA officer, the Board of Medical Practice, or the Delaware State Police.

68.     Inmates also witnessed harassment and retaliation against inmates who complained about abusive prison staff. These unconstitutional and illegal actions by defendants caused most abused inmates to be very afraid of what would happen to them if they filed a formal complaint against McDonald, so they did not file them. The defendants violated the civil right to be free from illegal sexual assault of every inmate at SCI, including plaintiffs, by immediately calling their claims of abuse unfounded, without properly reporting or investigating their claims.

69.     For six years DOC, CCS, Mosser, Johnson and Valentino ignored or denied and suppressed complaints about McDonald including grievances, verbal complaints to correctional and medical staff employees, and at least one lawsuit in Delaware Federal District Court. In that suit, filed on February 7, 2008, Ben Roten named Dr. McDonald, Former Commissioner Carl Danberg, Mike Deloy, Jill Mosser, the director of CMS, Diane Miller, and Richard Kearney as defendants.

70.     Upon the initial screening of Mr. Roten's complaint by the District Court, all Defendants were dismissed except for McDonald.   Roten answered defendant McDonald's interrogatories and filed them with the court on January 12, 2008. In his answers he identified some of the witnesses who had knowledge of his case. He identified the following individuals:

   a) Vincenza Fabber, the Mental Health Director at SCI, the first person from mental health that Roten talked to about what happened during the medical examination on October 25, 2006.  Roten explained everything that happened to him during the examination to Ms. Fabber in full detail.

   b) Diane Miller, who received the grievance filed by Roten on November 1, 2006, concerning the events of the October 25, 2006, examination.   She passed the grievance around to other medical staff and correction officers.

   c) Autumn Smith was with Dr. McDonald on November 10, 2006, when Dr. McDonald called Roten to medical to explain why he examined Roten the way he had.  She was in the room when McDonald was trying to justify his exam to Roten.

   d) While Roten was working as a janitor cleaning the guard shack at SCI on November 10, 2006, he had a conversation with Correctional Officer Sanchez and Correctional Officer Richardson during which Officer Sanchez mentioned that the inmates at

SCI have given Dr. McDonald the nickname "Dr. Feel Good" because of the way he conducts examinations.

e) Correctional Officer Richardson was present during the conversation with Roten and Officer Sanchez on November 10, 2006.

f) Correctional Officer William Gosnell was conducting a walk-through on the tier on November 11, 2006, when he directed a comment toward Roten, saying "I have my gloves on Ben let me examine you." When Roten asked Gosnell how he knew about Roten's situation with McDonald, Gosnell told Roten that he had read the grievance that was filed. Roten wondered how Gosnell had read the grievance when he had not yet seen the grievance board.

g) Correctional Officer Sgt. Sam Hastings read the grievance and spoke with Roten on several occasions about it.

h) Jill Mosser as the head of the grievance board was aware of the entire incident.

71.   A note Roten included with his responses to Defendant's Requests for Production Roten disclosed that at 11:00 a.m. on November 14, 2006 Gosnell called Roten to the office with Officer Henry and Sgt. Gibbs and told Roten about the grievance and the meeting that went on that morning. At 1:00 p.m. that same day, for the first time, a woman from medical and another woman named Jen talked to Roten about his grievance. They talked about how his grievance got out to the medical staff and about what Roten thought would be an appropriation action to take with McDonald. Roten told them to press charges on McDonald and fire him.

72.   On December 7, 2006, the grievance board, headed by Mosser, denied the grievance about McDonald. Roten was told he could appeal to the Bureau Chief, Richard Kearny, which he did, but the appeal was denied on March 12, 2007.

73.  McDonald filed interrogatory answers on May 14, 2009. In his answer to interrogatory 7 he denied that he knew that the officers and inmates at SCI had given him nicknames such as "Dr. Feel Good" and "Dr. McFondle" because of the way he conducted his examinations. In explaining the physical examination he first performed on October 25, 2006 he wrote:

> Holding each leg up and then pushing down on each leg is used to evaluate strength of legs and back. The genital exam includes palpating the testicles looking for masses, tenderness and presence and size of both testicles. The penis is positioned out of the way for the testicular exam.

74.  In answer 11 he wrote that the second examination performed on October 25, 2006, went as follows:

> The palpation of the shaft of the penis is to look for points of pain or masses and to express any discharge which may be present. The inspection of the urethra is to look for inflammation or discharge. This is not part of a routine genital exam but was performed after Plaintiff had completed his exam and had redressed.

75.  McDonald acknowledged that he received a copy of the grievance filed by Roten when he came into work in the morning. It was given to him by Diane Miller.

76.  The Delaware District Court eventually granted summary judgment to McDonald and the Third Circuit Court of Appeals upheld the decision. See *Roten v. McDonald*, 2009 WL 4348367 (D. Del.) and 2010 WL 3638810 (C.A.3 (Del.). However, many of the allegations by Mr. Roten can be found in these decisions.

77.  Plaintiff Roten alleged that during a chronic care visit on October 25, 2006, McDonald performed a physical exam upon him without wearing gloves. He complained that McDonald fondled his genitalia during an exam that took an inordinate amount of time. He complained of two separate examinations of his genitalia at that visit, the second one coming because the plaintiff asked if his frequent urination was a problem. Plaintiff claimed to have never

had a physical examination like the one he received from McDonald. Because he had a history of being molested as a child, the incident brought back bad memories, and he went to see the mental health counselors at SCI.

    a.  He filed a grievance about the abuse and the appeals of his grievances on November 1, 2006.

    b.  Nurse Miller received the grievance and showed it around to medical and correctional employees who made fun of the situation.

    c.  Nurse Miller also showed the grievance to McDonald, and on November 10, 2006, McDonald called Mr. Roten to medical where he attempted to explain to Mr. Roten why he had touched him the way he did.

78.    Mr. Roten eventually began to have almost weekly visits with Elena Padrell, a part-time, board-certified psychiatrist who worked at SCI and was employed by CMS.  Dr. Padrell resigned her position at SCI on March 15, 2007, stating in a letter to Former DOC Commissioner Danberg that she "had to resign or risk compromising my professional ethics." In that letter, Padrell outlined six reasons that supported her decision, the sixth reading as follows:

> Finally, during my treatment sessions with patients I was told by several of them about a very serious matter concerning the possible sexual abuse of inmates by a medical colleague. When I brought this to the attention of CMS officials I was told...that I should be a 'team player' and let those allegations pass. Doing so would be a serious violation of my professional ethics, however. Thus, when I realized that nothing was going to be done to even look into those allegations, I felt I had to resign and seek the opportunity to discuss these issues with you.

79.    In Former Commissioner Danberg's responding letter to Padrell he informed her that the allegation "of staff sexual misconduct reported to you by inmates...has been investigated by Internal Affairs and reviewed by the Medical Society of Delaware and determined to be unfounded." However, the Plaintiff received a letter from the Delaware Board of Medical Practice

advising him that his claim of sexual misconduct was "criminal in nature and therefore outside the jurisdiction of this agency to investigate." In fact, that was the usual reply of the Delaware Board of Medical Practice at that time to complaints of sexual abuse by healthcare providers. Recently the Delaware Board of Medical Practice issued a statement in which the Board denied ever receiving or investigating a complaint about McDonald

80.     Internal Affairs investigators at SCI are not medically trained investigators and their reports go to the warden at SCI, who decides if the report warranted any type of criminal or disciplinary charges. Internal Affairs investigators cannot file such charges.

81.     In Mr. Roten's case, McDonald's attorneys retained medical experts who claimed there were medical reasons for the examinations he performed on Mr. Roten. Mr. Roten, as an unrepresented inmate, was unable to retain medical experts to contradict those employed by McDonald.

82.     Despite the specific accusations of abuse by McDonald in 2006, the other defendants took no precautionary steps to prevent sexual abuse of inmates by a doctor in McDonald's position of power over inmates. Until McDonald's termination in 2013, they continued to allow him unfettered access to the inmates behind closed curtains with no other staff member present. The standard practice by primary care physicians in the local community is to inform patients that they may have a nurse present when being examined by the doctor. That practice was not followed at SCI and defendants did nothing about McDonald's known practice of sending the nurse out of the room before examining the inmates. These failures by defendants exposed countless additional inmates to McDonald's practice of fondling, groping, or digitally penetrating inmates without any medical justification.

83.    In March 2009, inmate Michelle Bloothoofd filed a complaint in Delaware Federal District Court against Former Commissioner Danberg and the warden of Baylor Women's Correctional Institute (BWCI). In her complaint, Ms. Bloothoofd alleged that a correctional officer sexually assaulted her on October 12, 2008. Despite filing grievances, writing to a captain at BWCI, and talking to treatment services at BWCI, nobody in authority would talk to her about what happened.

84.    DOC facilities, including SCI, have had a history of not aggressively pursuing inmate claims of sexual abuse by medical or correctional staff. It was not until the Dr. Earl Bradley case became public in December 2009, and it was publicly revealed that there were numerous prior accusations of molesting children against him, that attitudes about sexual abuse changed and investigations by the Board of Medical Practice and others became more thorough.

85.    Counsel for the American Civil Liberties Union Foundation of Delaware (ACLF) and two private attorneys filed a new complaint for Ms. Bloothoofd on October 11, 2010. They named Former Commissioner Danberg  and numerous DOC employees who worked at BWCI as defendants. They sought damages for Ms. Bloothoofd and injunctive relief against the defendants in order to enjoin them from sexually abusing women prisoners and allowing it to happen without taking any significant steps to prevent it.

86.    On the September 16, 2011, in an agreement between Ms. Bloothoofd, ACLF and the DOC defendants, DOC agreed to do certain things to help prevent sexual abuse of inmates including:

     a) DOC will receive and investigate all third-party complaints of sexual abuse and maintain records of the disposition of such complaints. DOC will publicly distribute information on how to report sexual abuse on behalf of an inmate.

b) All staff members are required to report immediately to the PREA (Prison Rape Elimination Act) Coordinator and DOC Internal Affairs any knowledge, suspicion, or information regarding SA (sexual abuse) that occurred in an institutional setting.

c) Immediately upon receipt of a grievance that asserts SA, retaliation for reporting SA, or staff actions that may have contributed to an incident of SA, the Inmate Grievance Chair shall deliver a copy of the grievance to the PREA Coordinator.

d) DOC will investigate all allegations of SA, including third-party and anonymous reports, for purposes of referral for criminal prosecution, disciplinary action and/or critical incident review. DOC will notify alleged victims in writing of investigation outcomes regardless of the source of the allegation.

e) DOC investigations into allegations of SA will be prompt, thorough, and objective. Where there is evidence of conduct that may constitute a crime, the Delaware State Police or local police agency will be contacted to assume the investigation.

f) DOC and BWCI will continue to have a zero tolerance policy for SA, pursuant to which all inmates have the right to be free from sexual abuse and all inmates and employees have the right to be free from retaliation for reporting sexual abuse.

g) DOC will treat all instances of sexual abuse as critical incidents to be examined by a team of upper management officials with input from line supervisors, investigators, and medical/mental health practitioners.

87.    On January 24, 2013, SCI inmate Korrie Smyre filed a lawsuit against Jason Amaral, Joyce Johnson and Leroy Williams, all of whom were counselors in the KEY program at SCI, and MHM Services, Inc., which was the company providing mental health, substance abuse and sex offender treatment at DOC institutions at the relevant time.

88.   According to the complaint:

a)  Defendant Amaral sexually harassed and abused Mr. Smyre from February through August of 2011 while he was in the KEY program at SCI.

b)   Counselors Johnson and Williams knew or should have known about the abuse and did nothing to stop it.

c)  Amaral initially made sexually provocative and suggestive comments to Mr. Smyre, and in April he began to force sexual contact with Mr. Smyre.

d)  Mental health MHM supervisor, Deneen Smith, witnessed Amaral spending an inordinate amount of time with Mr. Smyre and suspected inappropriate behavior. Either she did not report her observations to anybody or she was ignored. Ms. Smith's employment with MHM terminated in June 2011.

e)  Amaral threatened to have Mr. Smyre placed in administrative segregation if Mr. Smyre did not do what he wanted him to do.

f)   On July 5, 2011, Amaral caused Mr. Smyre to lose his privileges for fourteen (14) days because Mr. Smyre said something to him about the abuse.

g)  Around July 12, 2011, Mr. Smyre reported the abuse to a counselor, Defendant Johnson. She believed that Amaral was sexually abusing an inmate but thought it was a different inmate. Thereafter, Amaral quit physically sexually molesting Mr. Smyre but continued to talk with him.

h)  Around August 16 to 18, 2011, Mr. Smyre reported the abuse to Defendant Williams. Around August 19, 2011, Mr. Smyre met with Sergeant Hubbs, Sergeant Breedlove, and Sergeant Santini about the abuse and later that day met with Staff

Lieutenant Hickman for the same reason. Mr. Smyre did not see Amaral after August 19, 2011.

i)   Mr. Mike Tigue of DOC's Internal Affairs met with Mr. Smyre on or about August 30, 2011. Someone from Internal Affairs told Mr. Smyre not to tell anyone about the incidents with Amaral. He only talked to the mental health staff about the abuse after that.

89.   Despite the agreement settling the Bloothoofd case and the laws and regulations requiring it, there is no evidence that the allegations against Amaral or McDonald were ever forwarded to the Delaware State Police or the Board of Medical Practice by any of the defendants.

90.   DOC, CMS, CCS and their agents/employees have an ongoing history of failing to investigate and take action when inmates suffer sexual abuse at the hands of DOC staff and medical staff.  Even more disturbing is the ongoing cover up of the abuse by agents of DOC and CCS including Johnson, Valentino and Mosser.

SEXUAL ASSAULT OF THE CURRENT PLAINTIFFS

91.   The named plaintiffs all suffer from medical conditions that require periodic monitoring. Usually, this monitoring is done in a chronic care clinic and McDonald would be the doctor they saw most of the time. McDonald used Plaintiffs' medical conditions, no matter what they were, as a pretext to regularly fondle Plaintiffs' genitalia and perform rectal exams that were not medically necessary. During such exams, McDonald sexually assaulted Mr. Barrett, Mr. Keis, Mr. Medley, Mr. Talmo, Mr. Brown, Mr. Schultz, Mr. DeJesus, Mr. Jackson, Mr. Vincent, and other inmates who came into his care. Finally, on January 30, 2013, McDonald was fired because of a complaint that he sexually abused inmate Theodore Barrett.

23

GRADY & HAMPTON, LLC, PLAINTIFFS

<u>Mr. Barrett</u>

92.    McDonald sexually assaulted Barrett for the first time on September 26, 2012, after Barrett was summoned to medical for a follow up on recent blood work taken to monitor his thyroid condition. After McDonald discussed his thyroid levels with Barrett he told him to lay on the exam bed, with his shirt off, and pressed on his stomach. He then told Barrett to roll over on his side and put his knees up near his chest. Barrett did not know why he was asked to do this until McDonald told him "lift up your butt" so he could take a stool sample. He told Barrett that he was going to take it because he read in his record that he had been treated for hemorrhoids in the past when he was at Morris Correctional Institution (MCI). However, Barrett had a complete workup at MCI, including a colonoscopy that disclosed no abnormalities other than a mild hemorrhoid condition. The medication he was given for the hemorrhoid condition had worked and he was no longer having any symptoms of the hemorrhoid condition.

93.    Nevertheless, McDonald pulled Barrett's DOC prison pants down to his knees and inserted two fingers full length into Mr. Barrett's rectum and kept them there for 60-80 seconds, causing Mr. Barrett intense pain. When the nurse practitioner at MCI performed a rectal exam on Mr. Barrett, she used only one finger inserted halfway to obtain the stool sample. She then put a stool sample on a test pad for further evaluation as previous doctors had done when taking a stool sample. Mr. Barrett did not see any sample "pad" or "kit" in the room when McDonald insisted on obtaining a stool sample. Later, nurse Virginia at SCI confirmed Barrett's belief that was no reason to revisit the past hemorrhoid issue since he had already been treated for it at MCI and had seen an outside doctor in Lewes for a colonoscopy.

94.     McDonald next sexually assaulted Barrett on October 4, 2012. Barrett had been given a medication by McDonald to use on his face and the medication caused his entire face to break out in a rash with blisters so severe that it was difficult for him to see. He was in the medication line when Nurse Robin became alarmed by the severity of the rash and blisters and asked a correctional officer to immediately give him a pass to urgently see McDonald who was on duty in the medical unit. Nurse Christy took his vital signs when he arrived and helped him remove his shirt in front of McDonald, even though Barrett had no complaints of a rash anywhere but on his face.

95.     McDonald examined Barrett's stomach, back, and legs, but there was no apparent rash on them. Instead of ending the examination, McDonald looked at Barrett's eyes and ears with an examination light and then told Barrett to lie down on the exam bed.  He then began to touch and feel Barrett's head and face. At this point, Barrett was only wearing his underwear, socks and DOC pants. McDonald was not wearing medical gloves at any time throughout this exam.  After nurse Christy left the exam area, McDonald pulled the curtain closed. He then put both hands, palms down, on Barrett's chest and squeezed his pectorals for about five seconds. Then, using the tips of his fingers, McDonald felt down to the waist of Barrett's DOC pants. He instructed Barrett to "pull your pants down halfway so that if someone comes in you can pull them up fast and if there is a code they will come." A "code" is a defined meaning given to a set of numbers or colors that prison staff can broadcast over the intercom to rapidly get information to the whole institution. If Code 1 means officer down or in trouble, all officers who are available will rush to the area for which a Code 1 is called to assist the officer. If that happened for the infirmary, the available officers could end up there in a very short time.

96.     Barrett refused to pull his pants part way down and told McDonald he was in medical only to get treatment for the rash on his face. McDonald then put his hands lightly on Barrett's stomach. Barrett told him that his stomach was fine and he was only there because of the rash on his face and hands. Then, without warning, McDonald forcefully grabbed the front of Barrett's pants and with a sudden jerk pulled his pants down and away from his body. Barrett said "hey, no," but McDonald ignored his protest and lowered his head until it was 16 to 18 inches away from Barrett's penis. McDonald grabbed Barrett's inner thigh with his right hand and his testicles with the other hand and then rubbed his testicles and squeezed them about four times. Barrett tried to move on the exam bed, but that only caused his pants to come down farther. McDonald then put his right hand on Barrett's penis, which had been lying flat, with his thumb underneath of it. He then lifted it upward and placed it between his thumb and index finger while his other fingers remained in contact with the testicles. He then turned his hand left and right as if he was undoing a jar lid and then putting it back on. Barrett again said "hey you, no." McDonald responded "okay," but did not stop the assault. Instead he put his right hand on Barrett's left inner thigh and squeezed his penis about three times with his hand rubbing against his testicles. Barrett used his hands and feet to move himself up on the exam bed as far as he could and was about to roll off of the bed when McDonald said okay and backed away from the exam bed. Barrett began pulling up his pants and reaching for his shirt and shoes and McDonald peered through the curtain before opening it. Nurse Christy came back into the exam room as Barrett finished dressing. McDonald did nothing more with Barrett's file but told him "you just had a reaction to the prescription given to you for your face. Just don't use it again and in 2-3 days you will start to clear up. That's the problem." McDonald told nurse Christie to give Barrett hydrocortisone cream for his face, but they did not have any to give to him.

97.    On October 5, 2012, Barrett requested a sick call form so that he could report the latest incident to mental health.  He was not given a form until the next day. He completed the form and put it in the sick call box. He wrote that he needed to speak to someone about what happened in the doctor's office on October 4, 2012.  He did not receive an appointment with mental health until around October 25, 2012. The mental health worker he met with listened to him for about 10 minutes and then she told him she would report the incident to the head of mental health. Nothing more happened until he saw that same mental health worker walking by on October 31, 2012, and asked her again when someone would contact him. She said someone would contact him soon, and around 7:32 PM that day he was summoned to Lt. Tracey's office where Lt. Tracey and two other officers, whom he believes were also lieutenants, asked him questions about his medical visits with McDonald. However, when he attempted to go into detail about the assaults they would cut him off.

98.    Months passed and it seemed to Barrett as if nothing else was being done about the assault. Mr. Barrett filed a grievance in December of 2012 about the failure of anybody to do something about McDonald assaulting him. Approximately a week and a half after the grievance was filed Barrett was taken to see a lieutenant, who he describes as a large white male with a shaved head. It is believed that this was Lt. Blades. Lt. Blades seemed to be in an angry mood. He held the grievance form about 12 inches away from Barrett's face and asked him "is this a joke, did you write this – this your signature signed here?" Barrett said yes, he had filed a grievance about what McDonald did to him. The lieutenant replied, "Nobody needs to see this. You can't grieve this. It stops here. I'll handle this, you go back to your building."

99.    Lt. Hickman had informed Barrett that there would be no further contact between him and McDonald, but on December 9, 2012, Mr. Barrett was summoned to the medical office.

Barrett thought that he was being summoned to see another doctor, but when he got there he was surprised to see McDonald.

100.   On or about January 30, 2013, Barrett was called to a meeting at the medical office. SCI Warden Johnson, medical administrator Mosser, McDonald, Mr. Carr, Nurse Jen, and a doctor from JTVCC were all there. Barrett was asked to tell the group about the sexual assaults on 9/26/12 and 10/4/12. He told them everything and gave them a copy of the notes he had taken about the sexual assaults. Johnson then asked everyone in the room to vote on whether McDonald should be immediately terminated. They all agreed that he should be terminated. Johnson ordered security to remove McDonald from the premises. The entire interview was very stressful for Mr. Barrett and caused him to break down. He was allowed time to regain his composure before they returned him to his housing unit.

101.   Some time around August 2013 a SCI employee gave Barrett written information about the Prison Rape Elimination Act (PREA). He had to sign a paper acknowledging that he had received the information. The information he received had a list of "resources" from outside the prison for inmates to contact for crisis support. The phone number initially provided to the inmates did not accept calls from inmates. The "resource" they could write to did not return a response by mail. Subsequently, Lt. Blades provided Barrett new resource contact information.

102.   Barrett suffered retaliation by the correctional officers after filing the complaint against McDonald. Officers from Court and Transportation were working with correctional officer Massey in Barrett's housing unit when correctional officer Massey announced over the intercom, "Theodore Barrett for being the snitch of the month, come to the office and pick up your new mattress." When Mr. Barrett arrived at the office he was upset, but correctional officer Massey just said, "I don't know what you're talking about, but here's your new mattress."

103.   Barrett was moved without notice from SCI to James T. Vaughn Correctional Center (JTVCC) soon after he met with the group of prison officials and McDonald was fired. At JTVCC he was promptly put into disciplinary segregation. He was given no reason for being disciplined until about three months later when a counselor told him that his record showed that Johnson had sent him to JTVCC for punishment.

104.   This incident with Massey was reported to mental health counselor Lisa Marie after Barrett had been transferred to JTVCC. Eventually Barrett was returned to SCI. However, despite McDonald being fired at least in part because of his allegations of sexual abuse, the mental health providers at SCI have denied his request for counseling, instead giving him a pamphlet called *Snapping & Stressing, How to survive when locked-up*. The pamphlet includes "TIPS FOR LIVING IN THE FACILITY. Tips such as "Learn the rules and follow them" and "Rape is illegal activity when one is locked-up and needs to be reported as soon as possible".

### Mr. Keis

105.   In April 2009, McDonald diagnosed Mr. Keis with a chronic care condition for which Mr. Keis required blood work performed every three months. McDonald used the blood work results as an excuse to molest Mr. Keis. From April 2009 through May 2011, McDonald would see Mr. Keis to review the results from blood work relating to his chronic medical condition. At each visit, McDonald insisted on performing a "full physical exam" that included a prostate exam and fondling Mr. Keis's genitalia.

106.   When McDonald said he wanted to perform a prostate exam as part of the first "full physical exam," Mr. Keis asked why he needed another prostate exam since he had been given a "full medical exam," including a prostate exam, just two weeks prior. McDonald gave him no explanation other than "it is fine," before proceeding with the prostate exam.

107.    In 2009 correctional officer Joe Fields was working at the desk in medical and Mr. Keis told him that McDonald was touching him in inappropriate, non-medical ways. Mr. Fields simply shook his head and replied, "I just work here." Mr. Keis was not contacted by anyone on behalf of DOC, SCI, or CMS for the purpose of addressing his complaints and concerns about McDonald.

108.    During every three-month "exam" including the first one, McDonald flipped Mr. Keis's penis back and forth and felt under and around his scrotum without wearing gloves. Mr. Keis told McDonald he did not want him to touch him that way anymore, but McDonald insisted on doing it at every visit. Sometimes he would touch Mr. Keis's penis more than once during an exam. Mr. Keis estimates that McDonald touched his penis around 15 times in a two-year time frame.

109.    McDonald also tried to insist upon performing a rectal exam every three months when he examined Mr. Keis. Mr. Keis would ask McDonald why he needed a rectal exam so often. McDonald's only response was "it is part of the exam."

110.    During one "exam" McDonald told Mr. Keis to pull his pants down, lie on his side on the exam table and pull his legs up to his chest.  Mr. Keis did so and McDonald proceeded to "touch the rim of his butt." Mr. Keis was shocked, jumped up and yelled at McDonald "what are you doing?" McDonald told him he was going to do a rectal exam. Mr. Keis said, "Why did you cup my ass?"  McDonald just laughed and Mr. Keis began to yell at him. Mr. Keis was then escorted out of the exam room. Correctional officer Mike Shockley was in the area at the time and saw Mr. Keis yelling at McDonald.

111.    In May 2011, McDonald demanded that Mr. Keis submit to yet another rectal exam. When Mr. Keis refused to allow McDonald to perform the exam, McDonald responded by

threatening to take away the prescription medications Mr. Keis had been taking. Mr. Keis was not actually taking any medications, but the threat made Mr. Keis realize McDonald's "exams" were not true medical exams, but rather an excuse for McDonald to sexually abuse him.

112. Beginning in May 2011, Mr. Keis began refusing exams by McDonald. He also spoke to his counselor, Nancy Thomas, about McDonald sexually abusing him around that same time. He told Ms. Thomas how McDonald always wanted to touch him in inappropriate ways for what he believed were non-medical reasons. Ms. Thomas said she was concerned and that she had heard similar complaints. However, Keis saw no evidence that anybody investigated what McDonald was doing to the inmates.

113. Keis often heard correctional officer Lamont Hammond (Hammond) joke to inmates who were going to see McDonald that they were going to see "Dr. Feel Good" or he would say they were going to see "the finger" while holding up two fingers. When Keis asked Hammond, "What is wrong with Dr. McDonald," Hammond would laugh and say something like "you know you like it."

114. In 2013, when Keis learned that McDonald was no longer working at SCI, he stopped refusing medical visits. The doctor replacing McDonald does not molest him.

115. In January 2014, a lieutenant was sent by DOC to get all of the inmates to sign a paper saying that they had taken a course about PREA. Keis signed as asked, even though he had not taken the class. He was asked a lot of questions he found embarrassing and humiliating. Thus, when the lieutenant asked him if he had ever been sexually assaulted, he could not bring himself to talk about it and said "no."

### Mr. Medley

116.    Prior to 2011, Medley was being treated for chronic pain by the medical staff at SCI. However, at a medical visit in December of 2011, McDonald told Medley that he had a chronic care condition that required periodic monitoring.

117.    At a subsequent visit to McDonald for a rash on the inside of his thighs, McDonald told Medley to roll on his side because he wanted to see if it had spread anywhere else. While he was on his side, McDonald asked Medley when he last had a prostate exam. Mr. Medley did not remember having one, so McDonald performed one on him.

118.    Medley continued to be seen periodically by McDonald for follow-up on his chronic care diagnosis. At every visit McDonald required Mr. Medley to remove his pants and underwear so he could "examine" a vein in his inner thigh. McDonald would wrap his bare fingers on one hand around Medley's penis while using the other ungloved hand to "examine" the vein on his inner thigh. McDonald did not wear gloves while conducting the "exam." Medley does not believe that there was any medical reason for a vein in his inner thigh to be constantly monitored. Basically, every time he saw McDonald, McDonald did something inappropriate.

119.    At the last two visits, after McDonald "examined" Mr. Medley's inner thigh and fondled his penis, he instructed the victim to "relax." McDonald then grabbed the victim's penis with one ungloved hand and his testicles with the other and pulled on his penis while fondling his testicles.

120.    Mr. Medley wanted to say something about how he was being treated by McDonald, but he was afraid to do so for a number of reasons including the following:

   a.    He was aware that the correctional officers made jokes about Dr. McDonald, so they obviously knew about what was going on. Correctional officer Hammond even

32

told him that he witnessed McDonald pulling on an inmate's penis. He had heard the staff laugh when they would talk about what McDonald did to the inmates, and he was aware that the correctional staff gave Dr. McDonald the nickname of "the finger." Yet, nothing was being done about it.

b. He was aware that a number of inmates had complained about McDonald and nothing was being done about it.

c. He feared that if he complained about McDonald, McDonald would decrease his pain medication. In his experience medical staff treated pain medication like it was a privilege and had reduced the pain medication he had been on for two years after he filed medical grievances requesting radiology studies on his neck.

d. He feared that if he reported McDonald there would be retaliation against him that could affect his ability to get into and complete the KEY program.

e. He had reported a nurse for giving him the wrong medication; however, nothing was done about it. In his experience, complaining about medical was not going to help him in any way.

121.    On January 19, 2014, a sergeant came around to Medley's housing unit and made all of the inmates sign a piece of paper confirming they had taken a "30-day" PREA education class. There was no class. When Medley asked the sergeant about it, he smiled and said, "Oh, that just means we had 30 days to notify you."

122.    Recently, while Medley was waiting in line about a grievance, Hammond approached him and made comments about his doctor visits and grievances. He then stuck out two fingers and twisted them in a way similar to what he had done before when teasing inmates about McDonald.

123.    Mental health Counselor Tracy Coleman told Medley that she heard a lot of accusations about McDonald and claims that she reported them.

124.    Since the issues with McDonald have come up again, Medley has been suffering panic attacks and increased anxiety.  He has asked for assistance from the mental health care providers, but they have refused to give him any clinical interventions.  Instead, they sent him a pamphlet with a list of activities and exercises that are supposed to help with his panic attacks and anxiety.  This has made him feel like he is being told that being molested does not matter.

125.    Medley has also been having difficulty getting treatment for his physical health problems and believes that there might be a connection between his complaining about McDonald and his lack of care.

126.    Correctional Officer Hammond, on one occasion, told Medley that he had witnessed McDonald pulling on an inmate's penis.

127.    Medley filed a grievance against a nurse "Lynn" concerning the inappropriate way she spoke to him about McDonald.  The grievance was not heard.  Medley was told that he could not write a grievance about staff.

<u>Mr. Talmo</u>

128.    Talmo suffers from two chronic care conditions that require periodic monitoring and is a recovering drug addict.  McDonald began treating Talmo in 2006 by prescribing Vicodin for his pain.  By the end of 2007 McDonald was prescribing both Vicodin and Oxycontin, three times daily, with increasing dosage amounts that were not decreased until after McDonald was terminated in January 2013.

129.    Talmo went to see McDonald every 90 days for follow-up monitoring and care of his chronic medical conditions.  McDonald began sexually assaulting Talmo in 2008. During that

34

"exam" and subsequent exams, McDonald would have Talmo drop his pants and underwear to his ankles and he would then fondle Talmo's penis and testicles with his bare hands. During the "exams" McDonald would often rub his body against Talmo's legs. McDonald also periodically performed rectal exams on Talmo and when Talmo flinched because of pain, McDonald made him say "thank you, doctor."

130.    Talmo did not initially report McDonald because he was afraid his pain medication would be taken away as a retaliatory punishment. However, Talmo eventually spoke to Nurse Jenny about McDonald sexually assaulting him. She told Talmo that she knew something was going on because McDonald often sent her out of the room when he was getting ready to examine an inmate. Talmo also reported McDonald to Tracy in mental health.  To his knowledge, no action was taken because of his reports to nurse Jenny or Tracy in mental health.

131.    After McDonald was fired from SCI, Mr. Talmo was almost immediately taken off of Vicodin and Oxycontin by the medical staff at SCI. He was told that as a recovering drug addict he never should have been given these narcotics.

132.    Talmo fears retaliation from the correctional and medical staff at SCI because he is joining this lawsuit. He is concerned that it might hinder his requests for parole and pardon and that it might affect his ongoing medical care. However, he believes it is important to stand up for what is right, even if it could cause retaliation.

CURLEY & BENTON, LLC, PLAINTIFFS

Mr. Brown

133.    Raymond Brown was designated as a chronic care patient when he arrived as an inmate at SCI in or about October 2009. The medical problem for which Brown required chronic care was high blood pressure.

134.    Upon information and belief, when he arrived, Brown was housed in the PI Building. Correctional Sergeants Quillen and Van Heckle eventually sent Brown to the infirmary at the end of 2011 or beginning of 2012 because Brown had developed a cyst under his left armpit.

135.    Upon information and belief, McDonald treated Brown for the cyst at the infirmary. At the infirmary, McDonald instructed Brown to pull his pants down. McDonald fondled Brown's penis in a sexual manner.   McDonald was not wearing gloves.   This made Mr. Brown uncomfortable, but, as he had always been taught to trust his physician, Mr. Brown assumed it was medically necessary.  The following day, Mr. Brown saw McDonald again.   McDonald repeated the same process.

136.    Brown did not file a grievance against McDonald because he feared repercussions and retaliation from DOC staff for filing the grievance.  Brown was also aware that grievances were destroyed before reaching their final destination at SCI.  Finally, Brown feared repercussion because he had heard that Defendant G.R. Johnson was romantically involved with a nurse at SCI who was usually present when McDonald was working.

### Mr. Schultz

137.    Gene Schultz is an inmate at SCI designated as a chronic care patient due to having Hepatitis C.

138.    Upon information and belief, Schultz's first encounter with McDonald was in 2004. At that time, McDonald was working as the chronic care doctor for inmates.  From 2004 until approximately 2011, McDonald molested Schultz on numerous occasions. The final time McDonald molested Schultz was in 2011, when Schultz was incarcerated at the Morris Correctional Institute in Dover, Delaware, participating in the CREST Program, which is to aid in substance abuse recovery.

139.    Upon information and belief, during a typical "examination," McDonald would have Schultz pull his pants down to just above the knees. Mr. Schultz then would lie down on a table and McDonald would feel his abdomen, purportedly to check Schultz's liver. After touching Schultz's abdomen, Dr. McDonald would run his hands down over Schultz's genitals. Sometimes he would ask Schultz to cough while McDonald touched his penis and testicles, but on other occasions he would not ask Schultz to cough. McDonald did not wear gloves while he fondled Schultz's genitals.

140.    Upon information and belief, McDonald performed three prostate exams on Schultz over the years. Upon information and belief, McDonald typically used two gloved fingers for the exam, although he sometimes only used one. McDonald would then slide his fingers in and out of Schultz's rectum.

141.    Upon information and belief, because Schultz suffers from Hepatitis C, he has to have blood taken every two to three months. The blood is usually drawn from his arms. On at least one occasion, McDonald performed a "femur stick" to draw blood from his femoral vein and/or artery. Despite sticking Schultz's groin with a needle, McDonald drew no blood.

142.    Schultz did not file a grievance over the molestation he suffered at the hands of Dr. McDonald, as he feared retaliation by DOC staff for his filing a grievance and because he was embarrassed to be the victim of Dr. McDonald.

143.    Shortly after this lawsuit was filed on May 9, 2014, a report of the filing of the lawsuit ran on the television news. The next morning, Plaintiffs Schultz and Jackson were waiting in the medical area of SCI for medical treatment. Defendant K. Johnson, a correctional officer, and Defendant Fabber, an employee of Defendant Connections, were in the medical area.

144.    K. Johnson began harassing Schultz and Jackson about participating in this lawsuit. He accused both Plaintiffs of submitting sick calls for the sole purpose of being molested by McDonald.

145.    Fabber then joined in the discussion. Fabber works as a clerk for Connections, but he made much of the fact that he needed soap to wash his hands. After washing his hands, he stuck out his pointer and middle fingers on one hand and started thrusting them back and forth in the air as though to simulate one of the rectal exams performed by McDonald.

146.    The Plaintiffs' act of filing this lawsuit is an instance of Constitutionally protected conduct.

147.    The harassment by K. Johnson and Fabber constitute an "adverse action" to Schultz and Jackson. The harassment could "'deter a [prisoner] of ordinary firmness from exercising his constitutional rights'" to file a lawsuit for suffering abuse while incarcerated.[1]  Indeed, upon information and belief, the intended effect of K. Johnson's and Fabber's actions were to coerce Schultz and Jackson into dropping this lawsuit.

148.    The harassment occurred only after May 9, 2014, the date on which this lawsuit was initially filed. Accordingly, Schultz's and Jackson's participation in this lawsuit and filing of a grievance are the protected constitutional acts that were a substantial and/or motivating factor in causing this retaliation by K. Johnson and Fabber.

149.    Schultz filed a grievance regarding this conduct by K. Johnson and Fabber. The grievance went to Sergeant Hubbs. Sergeant Hubbs told you the incident would be handled as a PREA matter that would be sent to someone else. In response, an employee of Connections was sent to speak to Schultz and perform a suicide risk assessment.

---

[1] Quoted text from *Brown v. Williams*, 2001 U.S. Dist. LEXIS 25550, *6-7 (D. Del. Dec. 17, 2001) (internal citations omitted).

### Mr. DeJesus

150.    David DeJesus is an inmate who was designated as a chronic care patient for liver problems as a result of Hepatitis C.  As a chronic care patient, DeJesus saw McDonald multiple times while DeJesus was incarcerated.  Upon information and belief, McDonald molested DeJesus on two of those occasions.

151.    Upon information and belief, the first time McDonald molested DeJesus was while DeJesus was incarcerated at the Howard R. Young Correctional Institute in Wilmington, Delaware, in 2006.  DeJesus went to see McDonald for his liver, and McDonald instructed him to pull his pants down.  Dr. McDonald then performed a rectal examination on DeJesus.  He wore gloves and DeJesus is uncertain how many fingers McDonald used. McDonald, however, slid his fingers in and out of DeJesus's rectum.   DeJesus told McDonald he was not comfortable with the examination.

152.    Upon information and belief, on the same date, McDonald told DeJesus he was then going to check him for a hernia.  He began by feeling DeJesus's groin and genitals.  He then began to stroke DeJesus's penis in a sexual manner.   To provide a reason for continually stroking DeJesus's penis, McDonald kept saying his hand "slipped off" of his penis. McDonald would then grab his penis again and repeat.

153.    Upon information and belief, the second time McDonald molested DeJesus was while DeJesus was incarcerated at SCI in Georgetown, Delaware, in 2006 or 2007.  DeJesus again went to see McDonald for liver problems. McDonald performed another prostate exam similar to the one performed at the Howard R. Young Correctional Institute discussed above.  While keeping his gloved finger in DeJesus's rectum, McDonald reached around with his other ungloved hand and began fondling DeJesus's penis in a sexual manner.   DeJesus tried to pull away from.

McDonald, but he could not get away, as McDonald had one finger in his rectum and the other on his penis.

154.    Upon information and belief, after this second incident of molestation, DeJesus refused future prostate examinations by McDonald.  McDonald gave DeJesus a medical discharge in or about 2007.

155.    Mr. DeJesus did not file a grievance about the molestation by Dr. McDonald because of fear of retaliation by DOC staff. DeJesus had heard of inmates trying to push McDonald off of them while being molested only to be accosted and beaten by Correctional Officers for defending themselves from McDonald's advances.  He also did not file any grievance because when inmates submitted grievances, the Correctional Officers responsible for grievances would share the grievance with other Correctional Officers.  This led to embarrassment and humiliation of the inmate.  DeJesus is also aware that Correctional Officers will bully inmates into retracting their grievances.

156.    DeJesus wrote a letter to G. R. Johnson asking to speak to someone about McDonald, but Johnson never responded to the communication.

157.    Since the Complaint was filed in this case on May 9, 2014, DeJesus has been subjected to retaliation. Hutson has repeatedly yelled at DeJesus.  When DeJesus is in the chow hall, Hutson walks by DeJesus and bangs his keys on the table.  Hutson's behavior only began subsequent to May 9, 2014, and, upon information and belief, is in direct response to DeJesus's participation in this lawsuit.

158.    DeJesus submitted a grievance regarding Hutson to Santini.  Subsequently, Santini forced DeJesus to sign off on the grievance because Santini said he would "take care of it."

159.    After the Complaint was filed in this case on May 9, 2014, Santini told DeJesus that if he "keeps his shit up," DeJesus would be moved to the maximum security building where he would have no communication with anyone.  Again, upon information and belief, the reference to DeJesus's "shit" is his participation in this lawsuit.

160.    DeJesus's act of filing this lawsuit and of filing a grievance against Hutson are both instances of Constitutionally protected conduct.

161.    The harassment by Hutson, Santini's act of forcing DeJesus to sign off on the grievance about Hutson, and Santini's threat to transfer DeJesus to the maximum security building constitute an "adverse action" to DeJesus.  The harassment and threats could "'deter a [prisoner] of ordinary firmness from exercising his constitutional rights'" to file a lawsuit for suffering abuse while incarcerated.[2]  Indeed, upon information and belief, the intended effect of Hutson's and Santini's actions were to coerce DeJesus into dropping this lawsuit.

162.    The harassment, disregard of the grievance, and threat occurred only after May 9, 2014, the date on which this lawsuit was initially filed.  Accordingly, DeJesus's participation in this lawsuit and filing of a grievance are Constitutionally protected conduct that were a substantial and/or motivating factor in causing this retaliation by Hutson and Santini.

<u>Mr. Jackson</u>

163.    Derrick Jackson is an inmate who is a "brittle diabetic" and is thus a chronic care patient.  Jackson is incarcerated at JTVCC in Smyrna, Delaware.  Jackson was transferred to SCI from the James T. Vaughn Correctional Center in Smyrna, Delaware, in or about May 2007.

---

[2] Quoted text from *Brown v. Williams*, 2001 U.S. Dist. LEXIS 25550, *6-7 (D. Del. Dec. 17, 2001) (internal citations omitted).

164.    Upon information and belief, while at SCI, Jackson had multiple encounters with McDonald, as McDonald was charged with treating chronic care inmates.  McDonald always told Jackson to pull down his pants when he examined him.

165.    Upon information and belief, on one such occasion in or about 2010 or 2011, McDonald had Jackson lie on a table.  McDonald felt Jackson's abdomen.  McDonald claimed Jackson might have some gas built up inside him.  McDonald then moved his hand down to Jackson's groin.  McDonald fondled Jackson's penis and testicles in a sexual manner.  He did not instruct Jackson to cough.

166.    Upon information and belief, McDonald then instructed Jackson to roll over onto his right side.  McDonald said he was going to touch Jackson, and McDonald put his hands near the crevice of Jackson's butt.  McDonald, without further indication, then slid one or two gloved fingers into Mr. Jackson's rectum and asked Mr. Jackson, in a gentle voice, "how it felt."  Jackson, confused by the awkward question, said "alright."  McDonald then pushed deeper into Jackson's rectum and lifted his left butt check higher while pushing.  At some point, McDonald slid his fingers in and out of Jackson's rectum without any medical reason to do so.

167.    Upon information and belief, McDonald next reached around with the hand that had been on Jackson's butt cheek and grabbed Jackson's penis and testicles while keeping his other fingers inside Jackson's rectum.  Jackson did not say anything or complain because he trusted McDonald and thought McDonald was performing a procedure related to the gas built up inside of him.

168.    Upon information and belief, after this visit with McDonald, Jackson was sent out to have an ultrasound performed.

169.    Upon information and belief, Jackson saw McDonald on another occasion related to his liver. McDonald instructed him to pull down his pants. He again had Jackson lay on a table while he felt Jackson's abdomen. McDonald again began to touch Jackson's penis and testicles without asking Jackson to cough. While pushing on the side of Jackson's abdomen, McDonald held on to Jackson's genitals and asked if he felt pressure.

170.    Upon information and belief, McDonald then had him sit up on the table, and McDonald began to touch Jackson's buttocks where they met his back. A woman named Lynn then interrupted to say someone was looking for McDonald. McDonald instructed Jackson to pull his pants up. McDonald washed his hands. Lynn entered the area, and McDonald began discussing problems with Jackson's legs and feet.

171.    Upon information and belief, soon after this second encounter, Jackson heard that McDonald was no longer at SCI. Mr. Jackson subsequently met with Nurse Practitioner Katz. Mr. Katz told Mr. Jackson they had determined Jackson had contracted Hepatitis C. He also informed Jackson the medical staff learned Jackson was in the final stages of cirrhosis of the liver. Jackson believes that McDonald was indifferent to his health needs, and would have diagnosed his Hepatitis C in time for it to be treated, if not for his indifference.

172.    Jackson did not come forward sooner with reports and/or grievances regarding McDonald's conduct because he is aware of the frequency with which Correctional Officers and DOC staff at SCI retaliate against inmates who make complaints. Jackson feared, and continues to fear, retaliation for making complaints against McDonald.

173.    Jackson joins in the allegations stated in Paragraphs 143 – 148, above.

174.    Additionally, subsequent to the filing of this lawsuit on May 9, 2014, Defendant Hutson harassed Jackson by calling him one of "Dr. Feel Good's People" and calling him "Derelict

Jackson" over the prison's PA system.   These are further acts of retaliation for Jackson's participation in Constitutionally protected conduct are, upon information and belief, intended to persuade Jackson to drop this lawsuit.

### Mr. Vincent

175.   Joseph Vincent is an inmate at SCI who is designated as a chronic care patient due to degenerative joint disease.  Vincent has been incarcerated on multiple occasions, including time spent in the KEY/CREST Programs.  He saw McDonald numerous times from 2006 until McDonald was discharged.  Upon information and belief, McDonald fondled Vincent's genitals every time Vincent saw McDonald.

176.   Upon information and belief, whenever Vincent would see McDonald and for whatever medical reason Vincent would see McDonald, McDonald instructed Vincent to pull down his pants.  McDonald would then put a stethoscope in Vincent's groin to "listen" to his arteries.  McDonald would also grab Vincent's penis while he "listened" to Vincent's arteries.  McDonald always made it a point to run his hand over Vincent's genitalia as he removed the stethoscope from Vincent's groin.  McDonald did not wear gloves when he touched Vincent's genitalia.

177.   Upon information and belief, McDonald always recommended that Vincent undergo a rectal exam, and Vincent always declined until he heard from another source that men approaching the age of 50 should have such an exam.  Sometime around December 2012, Vincent permitted McDonald to perform a rectal exam.  McDonald instructed Vincent to lie on his side and smeared lubricant on Vincent and his fingers.  McDonald then inserted two fingers into Vincent's rectum.  He forced his fingers into Vincent's rectum until McDonald's knuckles prevented him

from going further. He also slid and thrust his fingers in and out of Vincent's rectum. Vincent finally said "enough." McDonald became flustered and stopped the "exam."

178.    Vincent did not file a grievance about McDonald's conduct. First, he did not want his pain medication decreased or taken away in retaliation, as he suffers constant pain due to his degenerative joint disease.   Second, having never had a prostate examination, he did not immediately realize the improper nature of McDonald's prostate examination. Third, Vincent also feared and continues to fear retaliation by DOC staff for reporting McDonald's conduct.

Mr. Vazquez

179.    Emiliano Vazquez is an inmate at JTVCC. Prior to being transferred to JTVCC on or about May 15, 2014, Vazquez was incarcerated at SCI in Georgetown, Delaware. Like many of the other Plaintiffs, Vazquez is a chronic care inmate. Upon information and belief, Vazquez sometimes saw McDonald without incident, but, on at least four occasions, he was victimized by McDonald.

180.    Upon information and belief, Vazquez's first inappropriate encounter with McDonald occurred in approximately 2008 or 2009. After a nurse checked his vital signs, he saw McDonald. McDonald instructed Vazquez to remove his shirt and to lay back on the examination table. McDonald also had Vazquez pull his pants down to his knees. When Vazquez complied, McDonald looked at Vazquez's genitals and made inappropriate comments about his genitals. McDonald rubbed Vazquez's penis and massaged his testicles without wearing gloves. McDonald pulled Vazquez's foreskin back and put his face very close to Vazquez's penis. When Vazquez questioned McDonald's behavior, McDonald suggested Vazquez was making a big deal out of nothing.

181.    Upon information and belief, Vazquez's second inappropriate encounter with McDonald occurred in 2009.  This inappropriate encounter was similar to the first inappropriate encounter in that McDonald inappropriately touched Vazquez's penis and testicles without a glove during the examination.  McDonald informed Vazquez he needed to check his rectum.  McDonald had Vazquez lay on a table with his knees pulled to his chest.  While wearing a glove, McDonald inserted his middle finger into Vazquez's rectum until his finger would not go any further.  He then thrust his finger back and forth several times.  During this process, McDonald had his face very close to Vazquez's butt.  McDonald then removed his finger, and looked at it.

182.    Upon information and belief, when Vazquez left the examination, he complained to Defendant Hammond.  Hammond replied that Vazquez had just seen "Dr. Feel Good" and that he makes inmates "feel good" before they go back to their cell.  Defendant Hammond then laughed at Vazquez.

183.    Upon information and belief, at a subsequent chronic care visit, Vazquez spoke to a nurse named Jennifer and requested a new doctor.  Jennifer said they would take it under advisement.  At subsequent visits, however, Vazquez was "treated" by McDonald, although Vazquez limited McDonald to what McDonald could "examine."

184.    Upon information and belief, sometime in 2011, Vazquez saw McDonald, who indicated Vazquez was having a problem with his liver.  McDonald said Vazquez would be alright, but Vazquez requested to see an outside provider.  McDonald denied the request.  Vazquez then spoke with the Administrative Nurse and repeated his request to be seen by an outside provider.  In response to his request, the Administrative Nurse asked if he thought he was a DuPont and said that if they sent inmates to outside providers, there would be no money.

185.    Upon information and belief, Vazquez had another chronic care appointment with McDonald – his third inappropriate encounter – approximately 90 days later. McDonald told Vazquez he was being difficult.  McDonald said he needed to allow him to perform an "examination" the way McDonald wanted to perform it so McDonald could treat Vazquez. Vazquez realized he was not going to be permitted to see an outside provider, so he consented to the "examination." McDonald again had Vazquez pull down his pants to his knees. Gloveless, he fondled Vazquez's penis and testicles and announced everything was "ok." Despite protest from Vazquez, McDonald gave Vazquez another rectal exam where McDonald thrust his middle finger back and forth in Vazquez's rectum. McDonald indicated something about the information from the last rectal examination never made it to the lab. After the last thrust, McDonald left his finger in Vazquez's rectum for a moment. McDonald pulled his finger out, looked at it, and put a stool sample in a tube.

186.    Upon information and belief, Vazquez filed a grievance with the prison and a medical grievance regarding McDonald's "examination" after either his second or third inappropriate examination.    Approximately one week later, Vazquez was sent to the Administration Building for a hearing on the grievance. He was met in the hallway by a Lieutenant Johnson, who was the hearing officer at the time. Lieutenant Johnson informed Vazquez he could not grieve this issue because McDonald was a doctor. When Vazquez tried to explain what had happened, Lieutenant Johnson said he "did not want to hear it" and declared the hearing was over. Vazquez was never able to even enter the room designated for the hearing.

187.    Upon information and belief, Vazquez's final visit with McDonald occurred in July 2012. McDonald did not have Vazquez pull his pants down, but he did have Vazquez lay back on the examination table. After performing some routine and appropriate examinations, McDonald

shoved his hand down Vazquez's pants and squeezed Vazquez's penis with his left hand. During this incident, McDonald brushed against Vazquez and Vazquez could tell McDonald had an erection. Vazquez pushed McDonald away and yelled at him. Defendant Hammond entered the room as did a nurse named Jennifer. Vazquez told them what had happened. Defendant Hammond escorted Vazquez out of the room. Defendant Hammond told Vazquez to file a grievance because "McDonald was out of control." Vazquez, however, did not file a grievance as, from past experience, he knew it would be futile.

Mr. Rogers

188.    D'Andre Rogers is an inmate suffering from asthma, allergies, and headaches. He is designated as a chronic care inmate. He was transferred from SCI from the Howard R. Young Correctional Institution in or about June 2011.

189.    Upon information and belief, within the first two weeks of arriving at SCI, Rogers encountered McDonald. Under the guise of performing a physical examination on Rogers due to his arrival at SCI, McDonald placed his hand on Rogers' testicles. McDonald had a glove on one hand, which may have been worn on the hand touching his testicles. With his other, ungloved hand, he simultaneously touched the shaft of Rogers' penis. McDonald massaged Rogers' testicles while touching the shaft of his penis. Rogers said something to which McDonald responded that physicals are "thorough" at SCI. McDonald said "Are you uncomfortable?" Rogers responded that McDonald should "do his job," as he thought McDonald was performing an appropriate examination.

190.    Upon information and belief, after returning to his cell in ASDA, Rogers learned from other inmates this was typical of McDonald and inappropriate. Rogers file a grievance once he was removed from ASDA. He met with a Lieutenant regarding his grievance. The Lieutenant

said it was "not our area" to address. He also asked Rogers if he was sure about what happened. The Lieutenant told Rogers nothing was going to happen about his grievance and convinced Rogers to throw the grievance in the trash. Rogers therefore threw the grievance away.

191.    Upon information and belief, Rogers' second encounter with McDonald occurred in December 2011 or January 2012. He was again seen for another physical after he was moved from the pretrial area to the compound. Rogers asked why he was having another physical, and McDonald said Rogers' "name came up." Rogers instructed McDonald not to grab his genitals, to which McDonald responded he would get a correctional officer's assistance if necessary. In light of his fear of being beaten by correctional officers, Rogers allowed the physical to continue. The second "physical" was similar to the first one. One glove was used. McDonald placed one hand on Rogers' testicles and the other hand on the shaft of Rogers' penis. At some point during the "physical," McDonald said that he was pressed for time during the first physical examination of Rogers. During the second "physical," he did not check Rogers' heartbeat, breathing, reflexes, etc. He squeezed Rogers' penis and moved his hand up and down on the shaft of Rogers' penis. McDonald also squeezed Rogers' thighs, rubbed his back, and rubbed his shoulders. When the "physical" was complete, McDonald announced that Rogers was "cleared to work."

192.    Upon information and belief, on the third occasion Rogers encountered McDonald, it was for a chronic care visit in February or March of 2012. McDonald asked Rogers about his asthma. He also asked Rogers if he needed any lotions or soaps. Rogers was given either a lotion or a soap he was not supposed to have, but McDonald gave it to him anyway. Rogers was also given medications for chronic care. McDonald checked his back and chest for breathing. He then asked if anything had changed, to which Rogers said "no." McDonald then asked if he could still check. Rogers assumed McDonald meant with respect to his asthma and chronic care problems.

McDonald then stuck his hand down the front of Rogers' pants. McDonald may have been wearing a glove. When Rogers asked McDonald what he was doing, McDonald said Rogers had given permission when Rogers agreed McDonald could check if anything had changed. McDonald squeezed Rogers' testicles and said everything still feels the same. He then asked Rogers if he had had the opportunity to "play with his balls" while incarcerated. While McDonald asked Rogers these questions, he continued to fondle Mr. Rogers' testicles. McDonald further encouraged Rogers to masturbate while in prison.

193.    Upon information and belief, during this third visit, McDonald had Rogers stand up. Rogers said he was not comfortable with this. McDonald put his hand in between Rogers' butt cheeks and recommended Rogers have a rectal exam. As Rogers was only in his mid-20's, he declined. McDonald said he had felt something strange on Rogers' testicles that justified a rectal exam. McDonald tried to spread Rogers' butt cheeks apart with his finger.

194.    Upon information and belief, in June or July of 2012, Rogers was again called to medical to see McDonald. The nurse indicated she believed this visit was for chronic care. McDonald greeted Rogers as though they were friends. McDonald made a comment that he "had the best job in the world." McDonald asked if everything was okay with respect to Rogers' chronic care conditions. He again gave Rogers lotion. McDonald asked Rogers if his joints were okay, if his back was okay, and if everything was okay "down below." Rogers replied everything was okay, and McDonald asked if he could check anyway. Rogers declined. Nonetheless, McDonald rubbed his chest and back making Rogers uncomfortable.

195.    Upon information and belief, Rogers saw McDonald one more time, sometime between September and November 2012. This was for his annual physical. As with prior

"physicals," McDonald squeezed Rogers' penis while massaging his testicles.   In all of the "physicals," McDonald appeared to be trying to get Rogers' penis erect.

Mr. Carrero

196.   Eliu Carrero is an inmate suffering from Type 2 Diabetes and is a chronic care inmate.   While incarcerated at SCI, he began seeing McDonald in approximately January 2011. As a chronic care patient, Carrero has to see the physician once every three months.

197.   At Carrero's first visit with McDonald, McDonald told Carrero he had to perform a full physical examination of Carrero.   McDonald had Carrero remove his shirt, and McDonald proceeded to squeeze Carrero's breasts stating he was examining for "lumps."   McDonald then had Carrero remove his pants.   McDonald then fondled Carrero's testicles and penis, again stating he was searching for "lumps."   Despite McDonald's proffered explanation, in reality, McDonald was stroking Carrero's penis.

198.   McDonald repeated these "physical examinations" every time Carrero would see McDonald.   McDonald had no medical justification for checking Carrero's testicles every three months.   McDonald did not wear gloves during these examinations.   During one visit, while McDonald was rubbing and stroking Carrero's penis, McDonald asked Carrero if he had an erection problem.   McDonald went on to say that Type 2 Diabetics have erection problems.

199.   On his second or third visit with McDonald, Carrero stated he was not comfortable with the nature of the examination and asked why he had to have a "physical examination" every three months.   McDonald told Carrero that Carrero needed to cooperate so McDonald could do his job.

200.   Carrero told the Correctional Officers in the medical area that he was uncomfortable with the nature of McDonald's examinations and that he thought McDonald was

acting inappropriately.  The Correctional Officers responded that McDonald was a doctor and "knew what he was doing."  Carrero also began to fear repercussions for reporting McDonald. When he attempted to say something about McDonald, Carrero was accused of lying.

201.    Carrero also reported McDonald's behavior to a mental health counselor at SCI. She responded that that was not her department and referred him to the medical department.

202.    Carrero wrote three grievances about McDonald, none of which were addressed.

203.    Finally, Carrero began to refuse the "physical examinations" performed by McDonald.  In response, McDonald took Carrero off of his medication citing Carrero's failure to cooperate.  As a result of being denied his medication, Carrero's health declined.  Carrero was finally able to begin his medicinal regiment once McDonald no longer worked at SCI.

ADDITIONAL GRADY & HAMPTON, LLC, PLAINTIFFS

Mr. Bramble

204.    At all times he was incarcerated from 2008 until McDonald was fired, Bramble was seen monthly by McDonald to receive care for his chronic asthma. At every visit McDonald insisted on performing a complete checkup, including checking his testicles. McDonald had no medical justification for checking his testicles every month.

205.    Bramble had to see McDonald for other medical issues too, and on one occasion, while being seen for a sprained ankle, McDonald told Bramble to pull down his pants. Bramble asked why and McDonald claimed he needed to check something. Bramble did as asked and while lying on the table McDonald told him to pull down his boxer shorts, which he did. McDonald then lifted his penis with his left hand and put his testicles in his right hand. Bramble felt very uncomfortable about what was going on and realized this wasn't a normal physical exam.

206.    Bramble soon discovered that other inmates had the same experience with McDonald. Even though he was he was upset about what McDonald was doing to him, he felt humiliated about what was happening, and was uncomfortable even talking to other inmates about what had happened. He would try to make a joke out of it in front of them. He knew better than to tell the correctional or medical staff about what was happening because they already knew and were doing nothing about it. The correctional officers were making jokes all the time about McDonald. Bramble remembers everyone calling McDonald, "Dr. McFondle" because no matter why you went to see him he insisted on checking your testicles.

207.    On occasion, depending upon the schedule, Bramble would see doctors other than McDonald in the chronic care clinic and none of them ever asked to check his testicles.

208.    Bramble was aware that inmates who filed grievances or complaints were frequently harassed or retaliated against by the correctional staff or the medical staff. Some of this knowledge came from witnessing what happened to other inmates, and some came from his experiences.

209.    While Bramble was at SCI, on or around 2008, correctional officer Earl Nelson, physically assaulted him for no legitimate reason. Nelson, who was known for assaulting inmates, was fired. However, after that, other correctional officers would tell him in a menacing way, that because of him a good officer had been fired. In fact, Nelson had a bad reputation even with some of the other correctional officers about verbally or physically abusing inmates.

210.    Bramble's experience in January 2014 at the Sussex Violation of Probation facility (SVOP), that is under the supervision of the SCI warden, illustrates that the leadership at SCI still does not take accusations of sexual harassment seriously, especially if the accusers are male. While at SVOP in January 2014, Bramble observed female correctional officer, Lieutenant Renee

Millman, frequently standing in the cafeteria calling out male inmates, who in her opinion, had pants that were too big for them. She would tell them that she wanted their pants to be tight enough so that she could see their "dick print".

211.    Bramble remembers an incident with Millman, when she called him into the laundry room at SVOP and told him that his pants, the pants he had been issued, were too big for him. Millman asked the size printed on the tag in his pants, and when Bramble did not know, she walked over and without Bramble's permission stuck her hand down the back of his pants searching for the tag. After she found and read the tag, Millman took her hand out of Bramble's pants. Bramble believes that Millman had no legitimate reason for putting her hand down the back of his pants.

212.    Bramble promptly told the lieutenant on duty what had just happened. When the lieutenant asked if they were supposed to just take his word for what happened, Bramble told him to look at the videotape of the area and it would show what happened. Bramble believes the lieutenant looked at the tape and saw Millman putting her hand down the back of his pants. He believes that Cpl. Kidd filed a statement in support of his claim that she had done so.

213.    Correctional officers still harass inmates who make accusations of sexual harassment by staff and continue to retaliate against inmates who have made such accusations. In fact, after Bramble promptly filed a grievance about Millman sticking her hand down the back of his pants, grievance officer, Lt. Kelly, who held the grievance hearing, was openly hostile toward Bramble. He kept pressuring Bramble to drop the grievance. Finally, Bramble asked him if he thought it would be a problem if he, a male officer, stuck his hand down the back of the pants of a female inmate. Kelly conceded that would be a problem.

214.    While the grievance was pending, Bramble was disciplined for having coffee from the kitchen, which the correctional officers believed was tobacco, in his possession. Bramble was moved from his housing unit to the sanction pod and was fired from his job. Then Kelly began telling Bramble he would be moved out of the sanction pod back to his regular housing unit and would get his old job back if he signed off on the grievance about Millman. Kelly told Bramble that if he didn't sign off on the grievance he would leave him in the sanction pod for 30 to 90 days while the matter was being investigated, and then find another reason to put him in there for another 30 to 90 days.

215.    Under the threat of not being able to get out of the sanction pod, Bramble signed off on his grievance in exchange for which his grievance was supposed to be investigated by internal affairs and the PREA officer. Bramble was then moved back to his regular housing unit and got his job back.

216.    A female PREA officer, with the last name of Murray, possibly a probation officer, met with Bramble about his grievance. During the meeting Bramble told her everything that had happened. He did not hear back from her, or anyone else at SVOP, about his accusations against Millman. Nobody from IA spoke to him about his accusations. Bramble was released in March 2014.

## Mr. Cox

217.    McDonald treated Cox as a chronic care patient just about every 90 days between January 2007 and January 2013. From the time McDonald first began treating Cox, he repeatedly checked him for a "hernia," even though Cox told him the hernia had been surgically repaired in 1998 and there was no need for him to keep checking for a hernia. Almost every visit involved Cox having to drop his pants and McDonald fondling his genitals for a "hernia."

218.    Cox's medical condition caused some skin lesions on his face and arms but not on his body or anywhere around his genitals.  He mentioned that to McDonald, but McDonald kept insisting that it was "standard procedure" for him to check the genitals at each visit.  This did not stop until McDonald was removed from SCI.

219.    Many times while McDonald was shining a light in Cox's eyes and mouth looking for evidence of this condition, he would lean against Cox so that his groin would be pressing against Cox's leg or knee.  Cox would move his leg, but McDonald would then go to the other side of him and do the same thing to his other leg.  Cox was afraid to report the behavior by McDonald because he saw other inmates who complained about things being harassed by the DOC staff.

220.    Cox is suffering harassment at the present time from the DOC staff in an unrelated matter.  He believes the harassment is because he was found "not guilty" on a disciplinary action by the disciplinary officer, only to be harassed anyway by members of the correctional staff.  He is constantly being moved within DOC and has been turned down for early release even though he is eligible for consideration.  He is fearful to even report the harassment because he is afraid of additional retaliation.

221.    Cox believes that Correctional Officer Hopkins and CNA Lynn, who both still work at SCI, have knowledge of what McDonald was doing, but Cox suspects that they might deny their knowledge because of fear of retaliation.

<u>Mr. Earl Garrison</u>

222.    After E. Garrison was diagnosed with diabetes in 2006, McDonald began to see him for chronic care about every 90 days.  He remembers McDonald checking for testicular cancer and grabbing his penis during diabetic chronic care checkups.  He also remembers multiple rectal

exams. These exams would always take place when the nurse was out of the room or on the other side of a curtain.

223.     Correctional Officer Hammond, who worked in the medical building, knew about McDonald and his inappropriate behavior. He was always joking about how McDonald "had been sticking his finger in inmates butts for years" and referred to McDonald as "drop your pants doc" or the "butt doctor." Hammond also claimed that McDonald was doing favors for inmates such as bringing in Percocet and OxyContin from the outside. E. Garrison remembers such statements on May 12 and May 13, 2014. He remembers nurse Beverly and Ms. Brenda being there when he made the statements.

224.     E. Garrison was afraid that he would be punished or harassed by DOC, the medical staff, or the doctor, if he were to complain about what McDonald was doing.

<u>Mr. Markez Garrison</u>

225.     From 2010 through 2012, M. Garrison was seen by McDonald every 60 to 90 days as a chronic care patient. The visits were primarily to review his lab work to make sure that his liver function tests were not elevated. At the beginning of each visit a nurse would be present in the cubicle, but McDonald would send the nurse out of the cubicle prior to conducting a rectal exam or exam of M. Garrison's genitals.

226.     M. Garrison recalls Correctional Officer Hammond telling him that he was going to see " Dr. Feel Good" when he was going to see McDonald. M. Garrison initially trusted McDonald until he found out from a subsequent doctor at SCI that it was not necessary for McDonald to have performed a genital or rectal exam at his every visit to a chronic care clinic. Upon learning that, he felt betrayed by McDonald.

### Mr. Hurst

227.   Hurst met with McDonald several times in 2012 or early 2013 to review the results of his blood work. On one occasion, Hurst remembers McDonald telling him to pull down his pants, upon which McDonald began touching his genitals. Hurst does not believe there was any medical reason for what McDonald was doing. On another occasion, McDonald insisted upon performing a rectal exam even though it had nothing to do with the medical conditions of Hurst. Hurst does not believe there was any medical justification for the rectal exam.

228.   Hurst believes he filed a medical grievance and another general grievance concerning what McDonald had done to him. He did not receive a response to either one.

229.   In May 2014, Hurst was working on the food court in MSB when he overheard correctional officers talking about what McDonald was doing. A correctional officer named Carl Thomas admitted that Wilbur Medley told him the year before what McDonald was doing to him. Medley wanted to know if Thomas would be a witness in a civil suit, but Thomas said he would not be a witness.

### Mr. Jolly

230.   Jolly remembers several rectal exams including one from several years ago, when McDonald had him drop his pants for a rectal exam. At some point during the exam he heard McDonald make a "weird sound like a moan." Then, before he knew what was going on, McDonald grabbed his penis. McDonald had his face near his penis and asked Jolly "how's that feel?" Jolly said, "What the hell man" and pulled away from McDonald. Since that incident Jolly has been very hesitant to go for medical treatment.

231.   Jolly did not file a grievance after the incident with McDonald because he has witnessed and experienced retaliation for filing a grievance. This is especially a problem at SCI

where inmates can count on excessive "shakedowns" of their cell if they file a grievance. Jolly was moved from the merit building to lockup for a few days about 4 months ago because he filed a grievance about something. He remembers a lieutenant in the building who used to say, "File them grievances if you want and I'll move your ass."

232.    Jolly has heard comments about "Dr. Feel Good" and statements like "I got an earache and the doc says okay drop your pants." He believes that everyone has known for years what McDonald was doing and it almost became an ongoing bad joke in the prison.

233.    Prior to the last incident with McDonald, Jolly remembers there was a nurse present in the area and that McDonald made her leave before the exam. He recalls her being a short blonde woman with a small tattoo on her forearm.

### Mr. Lewis

234.    While incarcerated between 2008 and 2012, Lewis received medical care for chronic conditions on a regular basis from McDonald.

235.    No matter what the reason for an appointment with McDonald, McDonald would always make Lewis drop his pants and would fondle his genitals for 10 to 15 seconds asking him how it felt. On one occasion he asked Lewis if he liked it. He remembers when he had a cut on his chin he still had to drop his pants for McDonald. McDonald would always send the nurse or assistant out of the room before making Lewis drop his pants.

236.    Lewis witnessed Correctional Officer Hammond taunting inmates who were going to see McDonald by telling them that they were going to see "Dr. Feel Good." He also heard Hammond refer to McDonald as "Dr. McFondle." Lewis believed that everyone at SCI knew what was going on with McDonald but would not do anything about it.

237.    Lewis tried to file a grievance about McDonald and what he had done to him, but the grievance was sent back as being about an issue that was non-grievable. In fact, most grievances about staff members, whether DOC or medical, are sent back as being non-grievable. An example occurred in or around 2010 in which an older inmate who had been working outside during the day complained of chest pains, yet McDonald would not send him to the hospital and told him he would be okay. Later that evening, the man died at SCI of a heart attack. Lewis believes that many inmates on the older inmate's cell block filed grievances about what had happened to him. However, all of them were returned as being non-grievable because the inmate himself had to grieve what happened to him. Lewis believes that the man was scheduled to get out of prison in a few weeks after having served a long sentence. Since other inmates were not allowed to grieve what happened, and as far as Lewis could tell the older inmate did not have family that visited him often, nothing happened to McDonald or any other CCS employee. Consequently, Lewis and other inmates believed they have no remedy for what McDonald was doing to them.

238.    Lewis also was at SCI in November 11, 2009 when Sgt. Biles, who frequently provoked and abused inmates, took inmate Usef Dickerson to a portion of the facility that was not covered by observation cameras, and with other C/O's, beat him severely. Biles was angry because Dickerson had spoken up about the abuse Biles was directing toward another inmate. 42 inmates signed a "Universal Petition" requesting that something be done about Sgt. Biles and the way he and other C/Os were provoking and abusing inmates. Biles however went around showing people his Masonic ring and saying that no one could touch him. To Lewis's knowledge, despite the unusually large number of inmates who had witnessed the event and were willing to talk about it to internal affairs, not one correctional officer was actually disciplined as a result of what had been

done to Dickerson. Some might have been transferred to other areas of SCI, but the main thing that happened as a result of the petition was retaliation against the inmates who signed it. In particular the inmates who were perceived as being the driving force behind the petition were threatened and retaliated against by C/O's involved with Sgt. Biles.

239.     Lewis observed that inmates were afraid to file grievances because if they did, they were often put back into maximum security where the lost visitation rights.   If they were put in max, they were not able to have visitors or see anybody. C/O's often put inmates who they had beaten in max so that nobody from the outside would see them until their cuts and bruises had healed somewhat.

## Mr. Weldin

240.     In August 2011, Weldon was taken from his cell for a medical check-up by McDonald.  He was nervous because he had heard McDonald referred to as "Dr. McGraby" or "Dr. McFeely" from other inmates and staff.   He recalls McDonald insisting upon examining "glands" which were located in the testicles.   He recalls McDonald fondling him for 15 or 20 seconds and making him cough several times.  He wanted to refuse but feared being sprayed or beaten by correctional staff if he did.

241.     Weldon was under the care of mental health in August 2011, and in his mental state at the time he accepted what happened to him as being part of his punishment.

242.     DOC staff assaulted Weldon in the holding area of the courthouse in September 2011.  He was beaten or choked until he passed out because he could not walk fast enough while shackled to suit the correctional officers.  All of the inmates in the holding area observed what happened to him.  Weldon did not file a grievance or complaint about being beaten or choked

because he was afraid of retaliation if he did so. Nothing happened to the C/O's who had abused him.

### Mr. Woolford

243.    McDonald made it clear while he was at SCI that Woolford was to see him only and no other provider. Woolford had a chronic condition and was seen by McDonald at least every 90 days. Woolford recalls McDonald "checking out" his genitals at every visit. McDonald did not use gloves when doing his examinations.

244.    Woolford observed and experienced ridicule by the correctional staff because of his visits with McDonald. The correctional officers knew of McDonald's issues and they would pick out inmates and make "Dr. Feel Good" jokes about them. They would ask things like "how many hands did he have on you?" "Did he give you a hand job too or did he get you with the 'let me check your prostate'?" Or, "Did you get the special wraparound?"

### Mr. Fox

245.    On November 1, 2012, Fox sustained a significant head injury and laceration as a consequence of being beaten by Cpl. Eben L. Boyce in the holding area of the courthouse in Georgetown. The beating was not justified and the laceration was not treated until Fox was returned to the pretrial section at SCI. After the initial treatment to close the laceration with stitches, Fox came under the care of McDonald for follow-up.

246.    Fox was kept in the infirmary for several days and the first time McDonald came to see him he took him to an exam room and told him he had to do a full physical. McDonald told Fox to remove his pants and then briefly checked his head injury. He then began to check over the rest of Fox's body, claiming he wanted to make sure he had not sustained any other injuries. No nurse was present during the exam. McDonald grabbed Fox's testicles and told him to cough,

which Fox initially thought was typical for a physical exam, but then McDonald grabbed Fox's penis and pulled on it and asked Fox if there was any pain. Fox said no and McDonald again pulled on his penis and this time asked him if it felt good. Fox was very disturbed by the question and told McDonald no. McDonald told Fox just relax because he was checking him for obvious signs of STDs. McDonald then told Fox to put his pants on and return to his bed.

247.    Although disturbed by what had happened, Fox did not file a grievance at that time, as he still thought that what happened could have been part of an exam. When he later learned that McDonald had been fired for molesting other inmates, Fox became very upset about how he had been treated by McDonald. Also, because of his experience with Boyce, Fox knew that any complaint or even a question could lead to retaliation and a beating.

## CLAIMS AGAINST MCDONALD

248.    Between 2006 and 2013, McDonald, working within the space and time limits of his job, under the pretext of providing medical treatment, repeatedly and continuously sexually harassed and assaulted inmates, including plaintiffs, against their will in a detention facility, to satisfy his own prurient interests and to embarrass, frighten, and humiliate them.

249.    McDonald's ongoing, intentional, and repetitive criminal sexual abuse of plaintiffs and other inmates constituted:

    a.   Unlawful sexual contact in the third degree in violation of 11 Del. C. § 767;

    b.   Rape in the third degree in violation of 11 Del. C. § 771;

    c.   Sexual relations in a detention facility in violation of 11 Del. C. § 1259;

    d.   Unprofessional conduct in violation of 24 Del. C. § 1730 (b) 2;

    d.   Battery;

    e.   Intentional and negligent infliction of emotional distress;

    f.   Abuse of the trust plaintiffs put in a treating physician;

    g.   Abuse of his position of power and control over plaintiffs;

    h.   Indifference to plaintiff's actual medical needs.

250.    At all times relevant, McDonald was obligated to provide medical care to inmates in the custody of the DOC, that did not violate their constitutional rights and met:

    a.   The standards of the local community;

    b.   The standards of the National Commission on Correctional Health (NCCHC);

    c.   The standards of DOC; and,

    d.   The requirements of the applicable laws and regulations of the State of Delaware.

251.    McDonald by repeatedly and continuously performing unwarranted rectal exams on inmates and fondling their genitalia without a legitimate medical purpose, for his own prurient interest, breached all of the above standards of care and violated the inmate's constitutional rights.

252.    McDonald's actions constituted one continuous course of medically negligent treatment and sexual abuse of inmates, including plaintiffs. His behavior continued across a lengthy period of time, and the multiple allegations and complaints about it were sufficient to put all other defendants on notice of his continued course of sexually abusing inmates during medical exams.

253.    McDonald was working within the space and time limits of his job with CCS when he engaged in the medical care of inmates and therefore McDonald and CCS are responsible for all harm that came to plaintiffs as a result of McDonald's breaches of the standards of care and his violations of their constitutional rights.

CLAIMS AGAINST MOSSER

254.    Between 2006 and 2013, Mosser, working within the space and time limits of her job as HSA, intentionally and continuously, failed to report the allegations which were common knowledge to the correctional and medical staff working in and around the infirmary, that McDonald was continuously and repeatedly sexually abusing inmates. In fact she worked with the management of CMS and CCS, as well as with the Warden and Deputy Warden at SCI to, intentionally and continuously, suppress such allegations and to prevent any investigation of McDonald's actions. Mosser repeatedly violated PREA and DOC policies related to PREA.

255.    Between 2006 and 2013, Mosser intentionally and continuously breached her duty under 24 Del. C. § 1731A (a)(1) to report any person certified and registered to practice medicine in the state, who may be guilty of unprofessional conduct, to the Delaware Board of Medical Practice. Mosser intentionally and continuously breached her duty under Section 1731A(a)(1) by failing to report to the Board the common knowledge allegations that McDonald was continuously and repeatedly sexually abusing inmates.

256.    Between 2006 and 2013 the present, Mosser intentionally and continuously helped cover up allegations that McDonald sexually assaulted inmates, such as plaintiffs. Her conduct breached all applicable standards of care and displayed deliberate indifference to the substantial risk that McDonald would continue to sexually assault inmates if she failed to act upon the inmate's allegations.

257.    Mosser intentionally and continuously violated the civil rights of every inmate abused by McDonald, including plaintiffs, by treating the allegations of abuse that were made against McDonald, as unfounded, without reporting or fully investigating the allegations for about six years.

258.   Mosser's actions constituted one intentional continuous course of breaching the standards of care, and breaking state law, by covering up McDonald's actions. Mosser and CCS are responsible for all harm that came to plaintiffs as a result of her actions.

## CLAIMS AGAINST CCS

259.   From July 1, 2010 through January of 2013, CCS as a matter of custom and practice, with deliberate indifference, failed to adequately discipline, train, and supervise the day-to-day activities of McDonald, Mosser, and other CCS nurses in regard to allegations of sexual abuse of inmates at SCI by McDonald. Such failures by CCS lead to repeated and continuous violations of PREA, and DOC policies related to PREA.

260.   As a result of the failures of CCS to supervise and discipline McDonald, he repeatedly intentionally and continuously performed unwarranted rectal exams on inmates and fondled their genitalia without a legitimate medical purpose, for his own prurient interest, breaching all applicable standards of care and state law.

261.   McDonald was working within the space and time limits of his job with CCS when he engaged in the medical care of inmates. Therefore CCS is liable to any inmates who were injured by McDonald's breaches of the standards of care, or by his violations of their constitutional rights.

262.   Employees and agents of CCS, including Mosser and other nurses working at SCI, for years heard reports that McDonald was sexually assaulting inmates, and did nothing to stop him or even investigate him. They also failed to report the allegations as mandated by applicable laws, regulations, and contract provisions. CCS nurses knew that McDonald was acting inappropriately with inmates because he often sent them out of the room when conducting "exams."

263.   CCS by its corporate policy failed to properly supervise and discipline Mosser and the other CCS nurses working at SCI, and consequently Mosser and the other nurses failed to report the accusations that McDonald was sexually assaulting inmates, including plaintiffs, to the proper authorities. In fact, by not reporting McDonald, Mosser and the other nurses intentionally and continuously cooperated in the cover up of his actions. Mosser and the other nurses were working within the space and time limits of their jobs with CCS when they breached the applicable standards of care, and violated state law.

264.   The failure of CCS, through its employees, to properly report the allegations that McDonald was sexually assaulting inmates, including plaintiffs, was a proximate cause of numerous additional sexual assaults that violated plaintiff's constitutional rights. CCS's failure also displayed deliberate indifference to the substantial risk that McDonald would continue to sexually assault inmates if CCS failed to act.

265.   The repeated failures of CCS to report McDonald were part of a policy and custom of CCS of ignoring the sexual abuse by McDonald and breaching the duty to report him.

266.   CCS is responsible for all harm that came to plaintiffs as a result of its actions and the actions of its employees.

CLAIMS AGAINST G.R. JOHNSON

267.   Johnson intentionally and continuously breached his duty to ensure that DOC, CMS, CCS, and employees of all three, including McDonald and Mosser, complied with PREA and all laws, regulations, rules, and standards of care, as well as the United States Constitution, when providing medical care to inmates, including plaintiffs.

268.   Johnson, as warden or deputy warden, had knowledge that inmates were alleging that McDonald was sexually abusing them under the guise of medical exams. Inmate grievances

were circulated through Johnson's office that gave, or should have given him, notice of the allegations against McDonald. Johnson also received at least one letter from an inmate with allegations about McDonald in the letter. In addition, Johnson has been dating, and reportedly is engaged to, a nurse who worked with McDonald at SCI. Many inmates told the nurse about McDonald's abuse and she knew that McDonald conducted exams of inmates without any other person in the room. Despite his knowledge of the allegations against McDonald, Johnson breached his duty to immediately report them to the SCI Prison Rape Elimination Act (PREA) officer, or to the Delaware State Police.

269. Johnson knew that under the United States Constitution he was charged with making sure that inmates received reasonable medical care, not sexual abuse. He intentionally and continuously breached his duty by allowing McDonald to sexually abuse inmates during medical exams.

270. Johnson failed to discipline, train, and supervise Valentino and the other correctional officers at SCI concerning the rights of inmates and their obligations under PREA to report all allegations of sexual abuse. This failure to train includes a failure to train in the protection of SCI inmates to ensure that they are not subjected to sexual harassment, sexual abuse, or harassment by anyone while in the care, control, or supervision of SCI.

271. Johnson failed to exercise reasonable and ordinary care and was negligent and reckless in overseeing the actions of DOC, CMS, CCS and their employees when it came to reporting and investigating all allegations of sexual abuse, including accusations against medical staff.

272. Johnson intentionally and continuously helped suppress and cover up the allegations that McDonald was sexually abusing inmates on a regular basis for years, before finally taking action against him in January 2013.

273. The failure of Johnson to report the allegations that McDonald was sexually assaulting inmates, including plaintiffs, was a proximate cause of numerous additional sexual assaults that violated plaintiff's constitutional rights and harmed them. Johnson's failures displayed deliberate indifference to the substantial risk that McDonald would continue to sexually assault inmates if he failed to act.

274. McDonald's behavior continued across a lengthy period of time, and the multiple allegations and complaints about it were sufficient to put Johnson on notice of his continued course of sexually abusing inmates during medical exams.

275. Johnson is responsible for all harm that came to plaintiffs as a result of his actions or the actions of the employees he was supposed to supervise.

276. Johnson intentionally and continuously violated the civil rights of every inmate abused by McDonald, including plaintiffs, by treating the allegations of abuse that were made against McDonald, as unfounded, without reporting or fully investigating the allegations for about six years

277. Johnson's actions continued across a lengthy period of time and constituted one intentional continuous course of violating plaintiff's constitutional rights.

## CLAIMS AGAINST VALENTINO

278. Valentino breached her duty to ensure that CMS, CCS, and employees of both, including McDonald and Mosser, complied with PREA and all laws, regulations, rules, and

standards of care, as well as the United States Constitution, when providing medical care to inmates, including plaintiffs.

279.    Valentino failed to exercise reasonable and ordinary care and was negligent and reckless in overseeing the actions of CMS, CCS and their employees when it came to reporting and investigating all allegations of sexual abuse, including any accusations against medical staff.

280.    Valentino, as deputy warden and major, had duties that gave her knowledge of grievances and other allegations by inmates that McDonald was sexually abusing them under the guise of medical exams. Deputy wardens in particular, often play a part in the grievance process. Despite her knowledge of the allegations against McDonald, Valentino intentionally and continuously breached her duty to immediately report the allegations to the SCI PREA officer or the Delaware State Police.

281.    Valentino intentionally helped suppress and cover up the allegations that McDonald was sexually abusing inmates on a regular basis for years.

282.    The failure of Valentino to report the allegations that McDonald was sexually assaulting inmates, including plaintiffs, was a proximate cause of numerous additional sexual assaults that violated plaintiff's constitutional rights. Valentino's failures displayed deliberate indifference to the substantial risk that McDonald would continue to sexually assault inmates if he failed to act.

283.    Valentino intentionally and continuously violated the civil rights of every inmate abused by McDonald, including plaintiffs, by treating the allegations of abuse that were made against McDonald, as unfounded, without reporting or fully investigating the allegations for about six years.

284.    Valentino is responsible for all harm that came to plaintiffs as a result of her actions or the actions of the employees she was supposed to supervise.

285.    Valentino's actions continued across a lengthy period of time and constituted one continuous course of violating plaintiff's constitutional rights.

## CLAIMS AGAINST HAMMOND

286.    Hammond knew there were multiple allegations by inmates that McDonald sexually molested them during medical exams, but breached his duty as a correctional officer by failing to promptly report the allegations to the SCI PREA officer. The failure of Hammond to report the allegations that McDonald was sexually assaulting inmates, including plaintiffs, was a proximate cause of numerous additional sexual assaults that violated plaintiff's constitutional rights.

287.    Hammond also violated the plaintiff's constitutional rights when he teased and harassed inmates about going to see "Dr. Feel Good" or "the finger" when they had an appointment with McDonald. His actions helped suppress and cover-up complaints against McDonald, which led to additional years of sexual assaults of inmates by McDonald.

288.    Hammond is responsible to plaintiffs for all harm they suffered as a result of his actions.

289.    Hammond's violations of inmate's constitutional rights continued as one continuous violation over a long period of time.

## CLAIMS AGAINST SANTINI

290.    Santini was aware that the original Plaintiffs filed this action against the original Defendants on or about May 9, 2014.

291.   As a direct result of DeJesus's involvement in this lawsuit, Santini threatened DeJesus with a transfer to the maximum security building for participating in Constitutionally protected activity.   Moreover, Santini forced DeJesus to withdraw a grievance filed against another correctional officer, Hutson, after Hutson harassed DeJesus for his participation in this lawsuit. These retaliatory acts are sufficient to deter a prisoner of ordinary firmness from exercising his or her Constitutionally protected rights.

292.   Santini's actions of threatening DeJesus and of forcing him to drop his grievance against Hutson were intentional and/or reckless.

293.   Santini's threat to send DeJesus to the maximum security building, thereby depriving him of communication with anyone, because of participating in this lawsuit constitutes extreme and outrageous conduct.

294.   Santini's actions were not in good faith nor with the belief that the interest of the public would be served thereby.

295.   Santini is responsible for all harm suffered by DeJesus as a result of Santini's harassment and retaliation.

296.   Santini's actions were part and parcel of the continuous efforts of Defendants to cover up and conceal McDonald's wrongdoing and to discourage McDonald's victims from coming forward.

### CLAIMS AGAINST HUTSON

297.   Hutson was aware that the original Plaintiffs filed this action against the original Defendants on or about May 9, 2014.

298.   As a direct result of DeJesus's involvement in this lawsuit, Hutson yelled at and harassed DeJesus for participating in Constitutionally protected activity.   These retaliatory acts are

sufficient to deter a prisoner of ordinary firmness from exercising his or her Constitutionally protected rights.

299.    As a direct result of Jackson's involvement in this lawsuit, Hutson called Jackson one of "Dr. Feel Good's People" and called him "Derelict Jackson" over the prison's PA system. This harassment was because of Jackson's participation in Constitutionally protected activity. These retaliatory acts are sufficient to deter a prisoner of ordinary firmness from exercising his or her Constitutionally protected rights.

300.    Hutson's actions were intentional and/or reckless.

301.    Hutson's actions constitute extreme and outrageous conduct.

302.    Hutson's actions were not in good faith nor with the belief that the interest of the public would be served thereby.

303.    Hutson is responsible for all harm suffered by DeJesus and Jackson as a result of Hutson's harassment and retaliation.

304.    Hutson's actions were part and parcel of the continuous efforts of Defendants to cover up and conceal McDonald's wrongdoing and to discourage McDonald's victims from coming forward.

## CLAIMS AGAINST K. JOHNSON

305.    K. Johnson was aware that the original Plaintiffs filed this action against the original Defendants on or about May 9, 2014.

306.    As a direct result of Schultz's and Jackson's involvement in this lawsuit, K. Johnson harassed both men for participating in Constitutionally protected activity.  These retaliatory acts are sufficient to deter a prisoner of ordinary firmness from exercising his or her Constitutionally protected rights.

307.   K. Johnson's actions were intentional and/or reckless.

308.   K. Johnson's actions constitute extreme and outrageous conduct.

309.   K. Johnson's actions were not in good faith nor with the belief that the interest of the public would be served thereby.

310.   K. Johnson is responsible for all harm suffered by Schultz and/or Jackson as a result of K. Johnson's harassment and retaliation.

311.   K. Johnson's actions were part and parcel of the continuous efforts of Defendants to cover up and conceal McDonald's wrongdoing and to discourage McDonald's victims from coming forward.

## CLAIMS AGAINST FABBER

312.   Fabber was aware that the original Plaintiffs filed this action against the original Defendants on or about May 9, 2014.

313.   As a direct result of Schultz's and Jackson's involvement in this lawsuit, Fabber harassed both men for participating in Constitutionally protected activity.  These retaliatory acts are sufficient to deter a prisoner of ordinary firmness from exercising his or her Constitutionally protected rights.

314.   Fabber's actions were intentional and/or reckless.

315.   Fabber's actions constitute extreme and outrageous conduct.

316.   Fabber's actions were not in good faith nor with the belief that the interest of the public would be served thereby.

317.   Fabber is responsible for all harm suffered by Schultz and/or Jackson as a result of Fabber's harassment and retaliation.

318.    Fabber's actions were part and parcel of the continuous efforts of Defendants to cover up and conceal McDonald's wrongdoing and to discourage McDonald's victims from coming forward.

## CLAIMS AGAINST CONNECTIONS

319.    Connections was the employer of Fabber.

320.    As a result of the acts of Connections' employee, Fabber, Plaintiffs have suffered the harms stated herein.

321.    Connections is liable for the acts of its employees (other than its employee's violations of Plaintiffs' civil rights) under the doctrine of *Respondeat Superior*.

## ONGOING CONSPIRACY OF DEFENDANTS

322.    Defendants McDonald, Mosser, G.R. Johnson, and Valentino conspired against plaintiffs when they worked in concert to intentionally and continuously cover up and suppress the fact that McDonald, under the pretext of performing medical exams, repeatedly touched, fondled, and digitally penetrated inmates, including Plaintiffs, against their will, for no legitimate medical reason.

323.    Defendants, despite warnings about McDonald sexually abusing inmates in 2006, for the next six years continued to allow him to examine inmates in private against sound medical practice, which resulted in many more inmates, including plaintiffs, to be sexually abused by McDonald.

324.    Defendants have continued to victimize plaintiffs by refusing to provide adequate mental health care to inmates who have had new or exacerbated mental health problems as a result of McDonald assaulting them.

325.    Defendants have also continued to victimize plaintiffs by harassing and threatening them for speaking out about the actions and misconduct of McDonald.   These threats and harassment are motivated, at least in part, upon information and belief, to discourage plaintiffs from pursuing this lawsuit.

326.    CCS is responsible for the conspiracy by its employees McDonald and Mosser.

327.    Connections is responsible for the conspiracy by its employee, Fabber.

328.    All defendants are responsible for the actions of those with whom they conspired.

### CIVIL RIGHTS VIOLATIONS AGAINST ALL DEFENDANTS
### (EXCEPT CONNECTIONS)

329.    42 USC Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws. The Eighth Amendment secures an inmate's right not to be sexually abused by a state employee or agent while in confinement. Severe or repetitive sexual abuse of a prisoner by a prison official or agent, such as McDonald, violates the Eighth Amendment. An inmate has a constitutional right [under the Eighth Amendment] to be secure in his bodily integrity and free from sexual attacks by agents of a prison.

330.    Sexual abuse of a prisoner by an agent of a prison has no legitimate penological purpose. A prison official's deliberate indifference to a substantial risk of repetitive sexual abuse of inmates by a medical doctor working at a prison violates their Eighth Amendment Constitutional rights and basic human rights to be free from sexual attacks by an agent of the state

331.    Defendants were aware of the unconstitutional conduct perpetrated by McDonald and failed to intervene to prevent such conduct despite the opportunity to do so.

332.    All individual defendants, and CCS, through the actions of its employees, and through its corporate policies and customs, are liable to plaintiffs for all of their own constitutional

violations as well as for the known constitutional violations of others that they ratified or to which they acquiesced.

333.    All defendants are subject to a Section 1983 claim for failing to provide plaintiffs reasonable care for their serious medical needs, and for knowingly allowing the plaintiffs to continue to suffer sexual abuse by McDonald. The failure of these defendants to report to the proper authorities the accusations that McDonald was sexually assaulting inmates, including plaintiffs, was a proximate cause of the numerous sexual assaults of plaintiffs, and violated their constitutional rights.

334.    The defendants were aware of, but covered up accusations that McDonald sexually assaulted inmates, such as plaintiffs, for over six years. They were deliberately indifferent to the substantial risk that McDonald would continue to sexually assault inmates if they failed to act upon the inmate allegations that he was sexually assaulting them.

335.    Defendants breached their duty by failing to oversee medical care at SCI, specifically complying with all applicable laws, regulations, rules, and standards of care, and the United States Constitution specifically as to the protection of inmates at SCI from sexual abuse.

336.    The acts and omissions of each of the defendants, including CCS through its employees and through its policies, were committed with deliberate indifference to Plaintiffs' constitutional rights and are the legal and proximate cause of the harm they suffered.

337.    All of defendant's actions continued across a lengthy period of time and constituted one continuous course of violating plaintiff's constitutional rights.

DAMAGES

338.    The combined actions of defendants, as stated above, continue to be the proximate cause of serious injuries to plaintiffs. Each plaintiff has suffered, is still suffering, and will suffer, some, if not all, of the following injuries:

a.  Multiple incidents of sexual abuse;

b.  Severe, physical, mental, and emotional pain, distress and suffering;

c.  Humiliation and embarrassment;

d.  Fear and mistrust of medical and correctional personnel;

e.  Retaliation and abuse, and the fear of retaliation and abuse, by correctional, or medical personnel including defendants, for reporting sexual abuse by McDonald;

f.  Depravation of the civil right to be free of cruel and unusual punishment;

g.  Depravation of the right to reasonable medical care for their serious medical needs;

h.  Deprivation of the right to have allegations of sexual abuse investigated instead of being ignored, suppressed, and covered up;

i.  Having to pay money for medical exams by a doctor who sexually assaults them during the exam.

WHEREFORE, plaintiffs Barrett, Keis, Medley, Talmo, Brown, Schultz, DeJesus, and Jackson, Vazquez, Rogers, Carrero, Bramble, Cox, E. Garrison, M. Garrison, Hurst, Jolly, Lewis, Weldin, Woolford and Fox demand judgment against all defendants, such special damages as they can prove, compensatory damages, punitive damages, attorney's fees, costs, all other damages permitted by statute, and such other relief as the court deems appropriate, including denying the defendants the benefit of any statute of limitations due to the illegal cover-up of McDonald's actions.

FURTHER, plaintiff Vincent demands judgment against defendants McDonald, Mosser, and CCS, such special damages as he can prove, compensatory damages, punitive damages, attorney's fees, costs, all other damages permitted by statute, and such other relief as the court deems appropriate, including denying the defendants the benefit of any statute of limitations due to the illegal cover-up of McDonald's actions.

GRADY & HAMPTON, LLC

/s/ Stephen A. Hampton
Stephen A. Hampton, Esq. (I.D. #2451)
Elizabeth C. Fillingame, Esq. (I.D. #5766)
6 North Bradford Street
Dover, DE 19904
Tel. (302) 678-1265
*Attorneys for Plaintiffs Barrett, Keis*
*Medley and Talmo*

CURLEY & BENTON, LLC

/s/ Patrick Gallagher
Patrick C. Gallagher, Esq. (I.D. #5170)
250 Beiser Boulevard, Suite 202
Dover, DE 19904
Tel. (302) 674-3333
*Attorney for Plaintiffs Brown, Schultz,*
*DeJesus, Jackson, Vincent, Vazquez, Rogers,*
*and Carrero*

Date: August 11, 2014