# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THEODORE BARRETT, RONALD KEIS, :
WILBUR MEDLEY, VICTOR TALMO, :
RAYMOND BROWN, GENE SCHULTZ, :
DAVID DEJESUS, DERRICK JACKSON, :
JOSEPH VINCENT, EMILIANO :
VAZQUEZ, D'ANDRE ROGERS, ELIU :
CARRERO, WILLIAM BRAMBLE, :
EUGENE COX, EARL GARRISON, :
MARKEZ GARRISON, RUSSELL : ·
HURST, ALLEN JOLLY, JOSHUA :
LEWIS, JAMES WELDIN, KEITH :
WOOLFORD, and JAKE FOX, :
:
       Plaintiffs, :
:
       v. :      C.A. No. 14-742-LPS
:
LAWRENCE MCDONALD, JILL :
MOSSER, CORRECT CARE :
SOLUTIONS, LLC, G.R. JOHNSON, :
LINDA VALENTINO, LAMONT :
HAMMOND, MICHAEL SANTINI, :
DONALD HUTSON, KURT JOHNSON, :
MICHAEL FABBER, and :
CONNECTIONS COMMUNITY :
SUPPORT PROGRAMS, INC. :
:
       Defendants. :

---

Stephen A. Hampton, GRADY & HAMPTON, Dover, DE

    Attorney for Plaintiffs Theodore Barrett, Ronald Keis, Wilbur Medley, Victor Talmo, William Bramble, Eugene Cox, Earl Garrison, Markez Garrison, Russell Hurst, Allen Jolly, James Weldin, Keith Woolford, and Jake Fox.

Patrick C. Gallagher, CURLEY, DODGE & FUNK, LLC, Dover, DE

    Attorney for Plaintiffs Raymond Brown, Gene Schultz, David DeJesus, Derrick Jackson, Joseph Vincent, Emiliano Vazquez, D'Andre Rogers, and Eliu Carrero.

Daniel A. Griffith, Chad J. Toms, WHITEFORD TAYLOR & PRESTON LLP, Wilmington, DE

    Attorneys for Defendants Lawrence McDonald, Correct Care Solutions, LLC, and Jill Mosser.

Michael F. McTaggart, Scott W. Perkins, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE

    Attorneys for Defendants G.R. Johnson, Linda Valentino, Lamont Hammond, Michael Santini, Kurt Johnson, and Donald Hutson.

Gary H. Kaplan, Art C. Aranilla, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington, DE

    Attorneys for Defendants Michael Fabber and Connections Community Support Programs, Inc.

---

## **MEMORANDUM OPINION**

September 25, 2015
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiffs, inmates who are currently or were previously incarcerated at the Sussex Correctional Institute ("SCI"), filed a civil rights complaint against Defendants pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and state tort law. Presently before the Court are: (1) Defendants Lawrence McDonald, Correct Care Solutions, LLC, and Jill Mosser's Motion to Dismiss for Failure to State a Claim (D.I. 22); (2) Defendants G.R. Johnson, Linda Valentino, and Lamont Hammond's Motion to Dismiss for Failure to State a Claim (D.I. 24); and (3) Defendants Michael Fabber and Connections Community Support Programs, Inc.'s Motion for Judgment on the Pleadings (D.I. 45).

## II. BACKGROUND

On May 9, 2014, Plaintiffs Theodore Barrett, Ronald Keis, Wilbur Medley, Victor Talmo, Raymond Brown, Gene Schultz, David DeJesus, Derrick Jackson, and Joseph Vincent filed a Complaint in the Superior Court of the State of Delaware in and for New Castle County alleging, *inter alia*, violations of 42 U.S.C. § 1983. (D.I. 1, Ex. A) Each claim arises out of alleged sexual abuse by Defendant Lawrence McDonald during medical examinations while Plaintiffs were inmates. (*Id.* at ¶ 1) This original Complaint alleged a cover-up including four additional Defendants: Jill Mosser, G.R. Johnson, Linda Valentino, and Lamont Hammond. (*Id.* at ¶ 2) It also named as a Defendant Correct Care Solutions ("CCS"), which had a contract to provide medical services at SCI pursuant to a contract with the Delaware Department of Correction ("DOC"). (*Id.* at ¶¶ 1, 21) On June 13, 2014, Defendants Mosser and CCS filed a notice of removal in this Court. (D.I. 1)

1

On August 11, 2014, based on a stipulation of the parties, Plaintiffs filed an Amended Complaint. (D.I. 20) The Amended Complaint added thirteen more Plaintiffs and five additional Defendants: Michael Santini, Kurt Johnson, Donald Hutson, Connections Community Support Programs Inc. ("Connections"), and Michael Fabber. (*Id.*; *see also* D.I. 14) Each of the additional Plaintiffs also claimed sexual abuse by McDonald during their time as inmates at SCI. (D.I. 20 at ¶¶ 15-27) The Amended Complaint also added claims by the original Plaintiffs against the new Defendants for retaliation in response to the filing of the original complaint. (*Id.* at ¶¶ 290-321)

On September 2, 2014, two sets of Defendants filed a Motion to Dismiss for Failure to State a Claim. The first was filed by Lawrence McDonald, Jill Mosser, and CCS (collectively, "the CCS Defendants"). (D.I. 22) The second was filed by G.R. Johnson, Linda Valentino, and Lamont Hammond (collectively, "the State Defendants"). (D.I. 24) On November 10, 2014, answers to the complaint were filed by Michael Santini, Kurt Johnson, and Donald Hutson (D.I. 43), as well as Fabber and Connections (collectively, "the Connections Defendants") (D.I. 44). On November 24, 2014, the Connections Defendants filed a motion for judgment on the pleadings. (D.I. 45) After reviewing the parties' extensive but not entirely clear briefing (D.I. 23; D.I. 25; D.I. 27; D.I. 28; D.I. 29; D.I. 30; D.I. 40; D.I. 41; D.I. 53; D.I. 54; D.I. 55), the Court ordered Plaintiffs "to submit . . . a chart identifying, for each Plaintiff, the claims they are asserting and the Defendant(s) against whom they are asserting each claim . . . [as well as] for each claim, the portions of the Complaint which provide the factual basis for each claim." (D.I. 59) Plaintiffs submitted these charts on February 23, 2015. (D.I. 61; D.I. 62) The Court heard oral argument on all three motions on February 25, 2015. ("Tr.")

2

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss for Failure to State a Claim

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a morion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion*

3

*Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported

conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,

113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*,

82 F.3d 63, 69 (3d Cir. 1996). "[A] complaint may be subject to dismissal under Rule 12(b)(6)

when an affirmative defense . . . appears on its face." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859

(3d Cir. 1994).

## B. Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the

pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." When

evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations

in a complaint as true and view them in the light most favorable to the non-moving party. *See*

*Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008). A Rule 12(c) motion will not be

granted "unless the movant clearly establishes that no material issue of fact remains to be

resolved and that he is entitled to judgment as a matter of law." *Id.*; *see also Maio*, 221 F.3d at

482. This is the same standard as a Rule 12(b)(6) motion to dismiss. *See Turbe v. Gov't of*

*Virgin Is.*, 938 F.2d 427, 428 (3d Cir. 1991). "The purpose of judgment on the pleadings is to

dispose of claims where the material facts are undisputed and judgment can be entered on the

competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec*

*Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (explaining that any documents that are

integral to pleadings may be considered in connection with Rule 12(c) motion).

## IV. DISCUSSION

Resolution of the three pending motions presents a somewhat daunting task for the Court. There are over 600 claims raised by the 22 Plaintiffs against 11 different Defendants. (D.I. 61; D.I. 62) The theories of liability are numerous, arising under both federal and state law, including negligence, assault and battery, medical malpractice, deliberate indifference to serious medical needs, and civil rights conspiracy. To address some of the issues presented, the Court must discuss the factual allegations of each individual Plaintiff.

Further exacerbating the challenge before the Court is that the Amended Complaint runs to 79 pages and the motions implicate the pleading requirements for numerous legal theories and affirmative defenses. Moreover, it was difficult for the Court to determine from the Amended Complaint and briefing exactly what claims are being alleged by each Plaintiff and against which Defendants. In the chart the Court ordered, Plaintiffs allege several theories of liability that were never addressed in the briefing. Defendants now argue that these claims have not been adequately pled in the Amended Complaint. (Tr. at 17-19)[1]

The Court perceives ten issues presented by Defendant's motions: (1) whether Plaintiffs included the affidavit of merit with their Amended Complaint necessary to support a medical malpractice claim against McDonald (Tr. at 12-13); (2) whether the statute of limitations bars Plaintiffs' claims against the CCS Defendants and the State Defendants (D.I. 23 at 7-13; D.I. 25 at 6-10); (3) whether Plaintiffs have failed to exhaust their administrative remedies as required

---

[1]However, even assuming Defendants were not previously on notice of the legal basis for certain claims, the Court is not here dismissing these claims on the ground that the Amended Complaint fails to state the legal basis for the claims. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (explaining that Rule 8(a) requires only that plaintiff plead facts that state claim with substantive plausibility, not that they precisely state their legal theory).

under the Prison Litigation Reform Act ("PLRA") for their federal claims against the CCS Defendants and the State Defendants (D.I. 23 at 14; D.I. 25 at 10-13); (4) whether Plaintiffs allege sufficient personal involvement to support their 42 U.S.C. § 1983 claims against the State Defendants (D.I. 25 at 13-17); (5) whether Plaintiffs have overcome the immunity provided for Johnson and Valentino under Delaware's Tort Claims Act for their negligent supervision claims (*id.* at 17-19); (6) whether Plaintiffs have adequately pled a 42 U.S.C. § 1985(3) conspiracy by the State Defendants (*id.* at 19); (7) whether Plaintiffs have adequately pled a conspiracy claim against the Connections Defendants (D.I. 45 at ¶¶ 16-21); (8) whether Plaintiffs pled a cognizable adverse action against the Connections Defendants sufficient to state a First Amendment retaliation claim under 42 U.S.C. § 1983 (*id.* at ¶¶ 23-25); (9) whether the Connections Defendants were acting under color of state law for purposes of 42 U.S.C. § 1983 (*id.* at ¶¶ 12-15); and (10) whether Plaintiffs have stated claims for intentional infliction of emotional distress or negligent infliction of emotional distress against the Connections Defendants (D.I. 55 at ¶ 11; Tr. at 18).[2] Below the Court addresses each of these issues in turn.

### A.     Affidavit of Merit

At oral argument, the CCS Defendants argued that Plaintiffs' medical malpractice claims were not supported by an affidavit of merit, as required under Delaware law. (Tr. at 17-19) Although this was not raised in the briefing, the affidavit of merit is a threshold requirement for a claim for medical malpractice in Delaware. *See* 18 Del. C. § 6853(a)(1). In filing their Amended Complaint, Plaintiffs served a notice on Defendants, indicating that they had filed the required

---

[2]The Court will address the adequacy of the intentional and negligent infliction of emotional distress claims only with respect to those Plaintiffs and Defendants for which these issues have been briefed.

affidavit in a sealed envelope. (D.I. 20, Ex. 1 at 2) Plaintiffs have in fact filed the affidavit of

merit under seal, as required by Delaware law. (D.I. 63) Accordingly, the medical malpractice

claims will not be dismissed on this ground.

## B. Statute of Limitations

In actions brought under § 1983, federal courts apply the applicable state's statute of

limitations for personal injury, including the coordinate tolling rules. *See Hardin v. Straub*, 490

U.S. 536, 541 (1989); *see also Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir.

1998).[3] In Delaware, personal injury claims are subject to a two-year limitations period. *See* 10

Del. C. § 8119.[4]

Although state law determines the applicable limitations period for claims under § 1983,

federal law determines the date of accrual of a § 1983 cause of action. *See Genty v. Resolution*

*Trust Corp.*, 937 F.2d 899, 919 (3d Cir. 1991). "A section 1983 cause of action accrues when the

plaintiff knew of should have known of the injury upon which its action is based." *Sameric*, 142

F.3d at 599.[5] Generally, "[t]he determination of the time at which a claim accrues is an objective

---

[3]The same statute of limitations applies to civil rights conspiracy claims under § 1985(3).
*See Lake v. Arnold*, 232 F.3d 360, 368 (3d Cir. 2000).

[4]No party argued in the briefing that a different statute of limitations or accrual rule
applied for any other claims; accordingly, the Court will apply the two-year statute of limitations
and the federal accrual rules to all claims at this stage. Plaintiffs' suggestion at oral argument
that a three-year statute of limitations applies to their medical malpractice claims (*see* Tr. at 55,
74) – which appears to be based on 18 Del. C. § 6856, which provides that a medical malpractice
claim "which, during such period of 2 years, was unknown to and could not in the exercise of
reasonable diligence have been discovered by the injured person, . . . may be brought prior to the
expiration of 3 years from the date upon which such injury occurred" – is an untimely, new
argument.

[5]Although Delaware's discovery rule, which provides that "when an inherently
unknowable injury . . . has been suffered by one blamelessly ignorant of the act or omission and

7

inquiry; we ask not what the plaintiff actually knew but what a reasonable person should have known." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009).

Although the Third Circuit has ordinarily focused on the objective test of what a reasonable person should have known with respect to his injury, *see Kach*, 589 F.3d 626 at 634, this does not mean that when a plaintiff subjectively, actually knows he has been injured that the statute fails to run if an objective person in that position may not have had such knowledge. As the Supreme Court has explained, the objective determination is made to ensure that the statute of limitations is not "in the sole hands of the party seeking relief." *Wallace v. Kato*, 549 U.S. 384, 391 (2007). Holding that a cause of action accrues for one who is subjectively aware of his injury at the time that he obtains such knowledge, regardless of whether a reasonable person in the same position should have known of his injury, does not conflict with the purpose of the objective test.

Before analyzing each individual Plaintiff's factual allegations and the statute of limitations issues raised, the Court will address an issue that applies more generally: whether application of the "continuing violation doctrine" means here that if any Plaintiff has alleged claims that accrued within the limitations period, then otherwise untimely claims asserted by other Plaintiffs are also saved from any time bar.

---

injury complained of, and the harmful effect thereof develops gradually over a period of time, the injury is 'sustained' . . . when the harmful effect first manifests itself and becomes physically ascertainable," *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. Del. 1994), might apply to § 1983 claims, *see Morton v. Sky Nails*, 884 A.2d 480, 482 (Del. 2005) ("The General Assembly restricted the time of discovery rule, as applied to medical malpractice claims, when it enacted 18 Del.C. § 6856. But Layton remains good law as applied to other actions."); *see also generally Kach v. Hose*, 589 F.3d 626, 643-44 (3d Cir. 2009) (considering application of Pennsylvania's discovery rule to § 1983 action), it would not change any of the Court's conclusions here, and the Court therefore need not decide its applicability.

## 1.    Continuing violation doctrine

The continuing violation doctrine is a narrow and equitable exception to the statute of limitations that "should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." *Cowell v. Palmer Twp.*, 263 F.3d 286, 295 (3d Cir. 2001). "[I]f the prior events should have alerted a reasonable person to act at that time, the continuing violation theory will not overcome the relevant statute of limitations." *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 416 (E.D. Pa. 1998), *aff'd*, 182 F.3d 903 (3d Cir. 1999). The continuing violation theory does not apply when the plaintiff is aware of the injury at the time it occurred. *See Montanez v. Sec'y Pa. Dep't of Corr.*, 773 F.3d 472, 481 (3d Cir. 2014).

Under the continuation violation theory, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). The Court must consider two requirements to determine if the continuing violation doctrine applies: (1) subject matter, that is, "whether the violations constitute the same type of [harm], tending to connect them in a continuing violation;" and (2) frequency, that is, "whether the acts are recurring or more in the nature of isolated incidents." *Cowell*, 263 F.3d at 292.[6]

A question raised here with respect to the continuing violation doctrine is whether it can

---

[6]A third requirement, "degree of permanence," was also part of the *Cowell* test. *See Cowell*, 263 F.3d at 292. The Third Circuit has recognized that this requirement has been superseded by Supreme Court precedent. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165-67 (3d Cir. 2013); *see also Cibula v. Fox*, 570 F. App'x 129, 136 n.7 (3d Cir. 2014).

apply to claims among different Plaintiffs; that is, whether there can be a "continuing violation" that would allow one Plaintiff's otherwise untimely claim to be timely due to continuing violations as to other Plaintiffs that are within the limitations period. Plaintiffs' argument for such application of the doctrine is primarily based on the Third Circuit's opinion in *Brenner*. However, *Brenner* does not apply the continuing violation doctrine in the manner sought by Plaintiffs.

In *Brenner*, the plaintiffs alleged violations of the Labor Management Relations Act against their local union for failure to refer them for work in a fair manner over an approximately seven-year course of conduct. *See* 927 F.2d at 1296. The Third Circuit, agreeing with a Seventh Circuit decision, held that this was a continuing violation, distinguishing this failure to refer from a discrete act, such as a failure to reinstate an employee. *See id.* (distinguishing *Lewis v. Local Union No. 100*, 750 F.2d 1368, 1378 (7th Cir. 1984)). Because the continuing violation doctrine saved each plaintiff's claims for the period in which each plaintiff was eligible for referral, "the applicable statute of limitations began to run against each union member plaintiff no later than the date he withdrew from the union." *Id.* In remanding to the district court, the Third Circuit explained that the district court was required to "apply the principles . . . to the facts of record *as to each plaintiff*" to determine whether the continuing violation doctrine could put that plaintiff's claims within the statute of limitations. *Id.* (emphasis added). *Brenner* did not, however, endorse an application of the continuing violation doctrine in the way that Plaintiffs propose the Court do so here.

The Court finds a recent decision of the Western District of Oklahoma, *Castillo v. Bobelu*, 1 F. Supp. 3d 1190 (W.D. Okla. 2014), to be persuasive on this issue. In *Castillo*,

multiple plaintiffs sued, alleging § 1983 claims arising out of sexual assaults while participating in required inmate job assignments at the Oklahoma Governor's Mansion. *See id.* at 1193. Each plaintiff in *Castillo* alleged sexual assault or rape by one of the defendants. *See id.* The plaintiffs argued that "because they allegedly were subjected to the same type of recurring harm and because there are 'multiple events involving multiple Plaintiffs within the applicable Statute of Limitations time,' plaintiffs are to be considered as one unit, rather than individually, for purposes of the limitations period." *Id.* at 1201 (internal citation omitted). The Western District of Oklahoma explained that "[p]laintiffs cite no authority for their novel position and the court is aware of none." *Id.* at 1201. This Court agrees with the *Castillo* court that Plaintiffs' proposed application of the continuing violation doctrine to them *as a group* would be novel, and would be inconsistent with Third Circuit law, which requires that each plaintiff demonstrate he or she suffered injury during the limitations period. *See Brenner*, 927 F.2d at 1295.

Counsel for Plaintiffs conceded at oral argument that without Plaintiff's proposed application of the continuing violation doctrine, the claims of Schultz and DeJesus against McDonald are barred by the statute of limitations. (Tr. at 58) ("[U]nless Your Honor applies the continuing harm doctrine on a group pleading basis, which we submit Your Honor should, their claims against McDonald are out, although I would submit to Your Honor that their claims against the other medical defendants and the other State defendants would go on because they, the other defendants, not McDonald but the other defendants continued to cover up what was going on and make difficult for anyone to do anything else beyond that time period.") Accordingly, these claims will be dismissed. With respect to every other Plaintiff against whom a statute of limitations defense is asserted, Defendants admitted that the continuing violation

doctrine could, in theory, properly apply to "a continuing course of conduct in terms of an inmate's medical treatment." (Tr. at 11)

## 2. Individual Plaintiffs

The statute of limitations defense is asserted against certain claims of all Plaintiffs other than Barrett and Fox (two Plaintiffs whom Defendants concede have only pled claims that are entirely within the limitations period). (D.I. 25 at 7)[7] The moving Defendants argue that the claims of the Plaintiffs who were only added in the Amended Complaint should not "relate back" to the original complaint, which would leave the newer Plaintiffs with a different operative date for limitations purposes. (D.I. 41 at 1 n.1) However, the parties originally named in the suit agreed by stipulation that all claims in the Amended Complaint relate back to May 9, 2014. (D.I. 17 at ¶ 1) Hence, all of the claims against the original Defendants "relate back" to the original complaint – which was filed on May 9, 2014 – for limitations purposes.

Except for Plaintiffs' concession regarding Schultz and DeJesus (mentioned above), the parties did not – either in their briefing or at oral argument – advance separate statute of limitations arguments with respect to claims against McDonald and claims against the other Defendants.[8] Hence, the Court addresses accrual of Plaintiffs' claims for purposes of the statute of limitations as argued by the parties, focusing on the timing of the McDonald's conduct as to each individual Plaintiff, and each individual Plaintiff's knowledge of the injurious nature of such conduct.

---

[7] Given the vagueness of the dates alleged by several Plaintiffs, early discovery focused on determining the dates of Plaintiffs' visits to McDonald might be warranted.

[8] Relatedly, it is not clear which claims against which Defendants are based on Plaintiffs' interactions with McDonald.

12

#### a. Keis

Keis alleges that he saw McDonald between April 2009 and May 2011. (*Id.* at ¶ 105) The Amended Complaint further alleges that Keis told a correctional officer in 2009 "that McDonald was touching him in inappropriate, non-medical ways." (*Id.* at ¶ 107) Keis also alleges that McDonald threatened to take away prescriptions from Keis if he refused a rectal exam, which "made Keis realize McDonald's 'exams' were not true medical exams, but rather an excuse for McDonald to sexually abuse him." (*Id.* at ¶ 111) Keis further alleges that he spoke to his counselor about the exams, and she told him that she had heard similar complaints. (*Id.* at ¶ 109) Finally, Keis alleges that Hammond joked to inmates who were going to see McDonald about McDonald's examinations and the conduct alleged by Plaintiffs. (*Id.* at ¶ 113) Keis allegedly refused exams by McDonald beginning in May 2011, and only began accepting medical visits again after McDonald was no longer at SCI. (*Id.* at ¶¶ 112, 114)

Based on Keis' allegations, Keis' subjective knowledge of the injurious nature of McDonald's conduct bars his claims to the extent they are based on that conduct. Keis alleges that he was aware that the examinations were inappropriate, that this caused him to refuse medical care beginning in 2011, and, thus, that he knew no later than May 2011 that he had been injured. (*See* D.I. 20 at ¶¶ 107, 112) He does not allege any improper examinations by McDonald after his refusal to be treated by him in May 2011. (*See id.* at ¶ 112) Under the circumstances, even if a reasonable person in Keis' position would not have known he was injured, Keis' actual, subjective knowledge of his injury meant the statute was running on claims based on McDonald's conduct. Hence, even taking all reasonable inferences in Keis' favor, these claims accrued prior to May 9, 2012 and, accordingly, they are barred by the statute of

13

limitations.[9]

### b. Medley

Medley alleges that he had chronic pain, which McDonald told him was a chronic care condition that required periodic monitoring. (D.I. 20 at ¶ 116) Medley's first identified visit with McDonald was in December 2011. (*Id.*) He alleges that he "continued to be seen periodically by McDonald for follow-up" but does not allege any specific dates for those encounters. (*Id.* at ¶ 117) He alleges that during a visit subsequent to December 2011, McDonald performed a prostate exam on Medley after McDonald had asked Medley to roll on his side to examine a rash on the inside of his thighs. (*Id.*) On other occasions, McDonald would require Medley to remove his pants and underwear, purportedly to examine a vein in his inner thigh. (*Id.* at ¶ 118) During this examination, Medley alleges that "McDonald would wrap his bare fingers on one hand around Medley's penis while using the other ungloved hand to 'examine' the vein on [Medley's] inner thigh." (*Id.*) Medley "does not believe that there was any medical reason" for this examination by McDonald. (*Id.*)

On his last two visits to McDonald, which do not have specific dates beyond approximately every 90 days, Medley alleges that McDonald, after undertaking the same type of conduct described above, "then grabbed [Medley's] penis with one ungloved hand and [Medley's] testicles with the other and pulled on [Medley's] penis while fondling [Medley's] testicles." (*Id.* at ¶ 119) Medley alleges that he "wanted to say something about how he was

---

[9]As noted, it is not clear which claims against which Defendants are based entirely on Plaintiffs' interactions with McDonald. By separate order, the parties will have an opportunity to advise the Court as to the impact of its conclusion here for each of Keis' claims against each Defendant.

14

being treated by McDonald, but was afraid to do so for a number of reasons." (*Id.* at ¶ 120) Medley, like Keis, "was aware that the correctional officers made jokes about Dr. McDonald, so they obviously knew what was going on," and he specifically alleges that Hammond made jokes about McDonald's conduct. (*Id.* at ¶ 120(a)) Medley also alleges that he was aware of complaints about McDonald by other inmates. (*Id.* at ¶ 120(b))

Like Keis, Medley has pled facts that suggest he was aware of his injury at some time prior to McDonald's termination in January 2013. (*See id.* at ¶ 128) However, unlike Keis, he has not specifically pled when he became aware of the injury, or that he was actually aware of it before May 9, 2012. Further, unlike Keis, he has not specifically pled that his encounters with McDonald ended prior to May 9, 2012. The Court cannot infer that all of his claims based on these encounters accrued prior to May 9, 2012, or that a reasonable person would have been aware of the injuries before May 9, 2012. Accordingly, the Court cannot say that it is clear on the face of the complaint that Medley's claims are barred by the statute of limitations.

### c.    Talmo

Talmo began being treated by McDonald "in 2006" and saw McDonald "every 90 days" for "two chronic care conditions that require periodic monitoring." (D.I. 120 at ¶¶ 128-29) He alleges that the sexual assaults against him began in 2008. (*Id.*) Talmo also alleges that McDonald prescribed Vicodin and Oxycontin, three times daily, with increasing dosages, from the end of 2007 until January 2013, when McDonald was terminated. (*Id.* at ¶ 128) Talmo alleges that he did not report McDonald for the sexual assault because he was afraid that McDonald would retaliate by taking away his pain medication, but he eventually spoke to a nurse and a mental health staff member about the sexual assaults, at unspecified times. (*Id.* at ¶ 130)

15

Talmo alleges that after McDonald was fired, he was immediately taken off of Vicodin and Oxycontin, and "told that as a recovering drug addict he should never have been given these narcotics." (*Id.* at ¶ 131)

Talmo has pled that sexual assault occurred every 90 days until January 2013, and, accordingly, he has pled some injury within the limitations period.[10] (*See id.* at ¶¶ 128-29) While Talmo, like Keis, has pled that he was aware of the injury prior to January 2013 (*id.* at ¶ 130), like Medley Talmo has not pled when he actually became aware of the improper nature of the examinations, except that it occurred sometime between 2008 and January 2013. At this stage, the Court draws all reasonable inferences in Talmo. Accordingly, the Court will not hold that Talmo's claims are barred by the statute of limitations.

### d. Brown

The only two encounters alleged between Brown and McDonald were "at the end of 2011 or beginning of 2012" due to a cyst. (*Id.* at ¶ 134) Brown alleges that during treatment, McDonald fondled his penis at each visit, and that he was "uncomfortable" but "assumed it was medically necessary." (*Id.* at ¶ 135)

Brown does not allege when he became aware of his alleged injury. Further, he pleads that he believed that while McDonald's examinations made him "uncomfortable," he had "always been taught to trust his physician," so he "assumed [the examinations were] medically necessary." (*Id.*) At this stage, the Court will not hold that a reasonable person would have discovered before May 9, 2012 that McDonald's examinations in late 2011 or early 2012 were

---

[10]Talmo has also pled other ongoing conduct – the improper prescription of Vicodin and Oxycontin – which he did not discover was improper until January 2013. (D.I. 20 at ¶¶ 128, 131) It is unclear, however, if this is the basis for any of Talmo's claims.

16

not medically necessary. No facts are alleged to suggest that Brown should have become aware

of his injury prior to May 9, 2012. Likewise, there are no allegations to suggest that Brown had

actual knowledge that he had been injured prior to May 9, 2012. Thus, at this stage, the statute of

limitations defense does not appear on the face of the complaint, and dismissal of Brown's

claims would be improper.

### e.   **Jackson**

Jackson was a chronic care patient due to his diabetes. (*Id.* at ¶ 163) He was transferred

to SCI in or about May 2007. (*Id.*) He alleges that during his multiple encounters with

McDonald during chronic care treatment, "McDonald always told Jackson to pull down his pants

when [McDonald] examined him." (*Id.* at ¶ 164) On one occasion in or about 2010 or 2011,

McDonald allegedly fondled Jackson's genitals in a sexual manner, after "claim[ing] Jackson

might have some gas built up inside him." (*Id.* at ¶ 165) During that same visit, McDonald

allegedly "slid his fingers in and out of Jackson's rectum," and later "reached around with the

hand that had been on Jackson's butt cheek and grabbed Jackson's penis and testicles while

keeping his other fingers inside Jackson's rectum." (*Id.* at ¶¶ 166-67) Jackson alleges that he

"did not say anything or complain because he trusted McDonald and thought McDonald was

performing a procedure related to the gas built up inside of him." (*Id.* at ¶ 167)

Jackson also alleges that on another occasion, McDonald had Jackson pull down his pants

and lay on a table, while McDonald felt Jackson's abdomen, after which McDonald touched

Jackson's genitals and asked if Jackson felt pressure. (*Id.* at ¶ 169) Jackson alleges that

McDonald then "began to touch Jackson's buttocks where they met his back" but when another

person interrupted, McDonald instructed Jackson to pull his pants up and "began discussing

problems with Jackson's legs and feet." (*Id.* at ¶ 170) Jackson also alleges that after McDonald stopped working at SCI, he met with a nurse practitioner, who informed McDonald that he had contracted hepatitis C and "was in the final stages of cirrhosis of the liver." (*Id.* at ¶ 171) Jackson alleges that his hepatitis C would have been diagnosed in time for it to have been treated were it not for McDonald's indifference to his medical needs. (*Id.*)

It is not apparent on the face of the complaint that Jackson's claims are barred by the statute of limitations. With respect to his hepatitis C, Jackson has pled he was unaware he had contracted it until after January 2013, and there is no basis from which the Court can conclude that a reasonable person would have discovered this before May 9, 2012. Likewise, with respect to the remainder of the allegations, Jackson has pled he believed there was a legitimate medical reason for the examinations, and it is alleged that Jackson trusted McDonald in performing these procedures. Jackson has not pled actual knowledge of his injuries, and at this stage the Court will not hold that a reasonable person would have discovered the injuries prior to May 9, 2012. Accordingly, Jackson's claims will not be dismissed based on the statute of limitations.

### f. Vincent

Vincent was a chronic care patient due to degenerative joint disease. (*Id.* at ¶ 175) He alleges that he saw McDonald "numerous times from 2006 until McDonald was discharged" in January 2013, and that "McDonald fondled [his] genitals every time [he] saw McDonald." (*Id.* at ¶¶ 175-76) He also alleges that McDonald always recommended a rectal exam, but that he declined until he heard that men approaching the age of 50 should have an exam, and he permitted McDonald to perform one in December 2012. (*Id.* at ¶ 177) Vincent alleges similar conduct by McDonald as other Plaintiffs during this exam. (*Id.*) Vincent claims that "he did not

immediately realize the improper nature of McDonald's prostate examination" because he had never had one previously. (*Id.* at ¶ 178)

The conduct in December 2012 clearly falls within the statute of limitations period, as it occurred after May 9, 2012. With respect to the conduct prior to the December 2012 visit, there are allegations that Vincent believed there was a legitimate medical reason for the examinations, and that McDonald told Vincent the same. The Court cannot infer that a reasonable person would have nevertheless known about the injury. Therefore, the Court will not hold that Vincent's claims are barred based on the statute of limitations.

### g. Vazquez

During the relevant time, Vazquez was a chronic care inmate at SCI. (*Id.* at ¶ 179) Vazquez alleges that on at least four occasions between 2008 and July 2012, he was "victimized" by McDonald. (*Id.*) On the first occasion, "in approximately 2008 or 2009," McDonald touched Vazquez's genitals in an allegedly inappropriate way. (*Id.* at ¶ 180) In the second encounter, in 2009, McDonald did the same, and also performed an allegedly inappropriate rectal exam. (*Id.* at ¶ 181) After this examination, Vazquez alleges that he complained to Hammond, and Hammond replied that "Vazquez had just seen 'Dr. Feel Good' and that [McDonald] makes inmates 'feel good' before they go back to their cell" and "laughed at Vazquez." (*Id.* at ¶ 182) On a subsequent visit, Vazquez asked a nurse for a new doctor, and when he had to see McDonald, he limited the scope of the examination. (*Id.* at ¶ 183)

Later in 2011, Vazquez was told by McDonald that McDonald needed the examination to be performed a certain way for Vazquez to obtain treatment, and when Vazquez realized he would not be permitted to see an outside provider, he consented. (*Id.* at ¶ 185) On that occasion,

Vazquez's genitals were fondled and McDonald performed another rectal exam that was allegedly inappropriate. (*Id.*) Following either the second or third incident, Vazquez filed a grievance against McDonald, but – when sent to the hearing – was told that he "could not grieve [that] issue because McDonald was a doctor." (*Id.* at ¶ 186) The last incident was in July 2012, when Vazquez's genitals were inappropriately touched by McDonald, and Vazquez pushed McDonald away and yelled at him. (*Id.* at ¶ 187)

The incident in July 2012 is clearly within the limitations period, as it came after May 9, 2012. However, Vazquez has specifically pled knowledge of the improper nature of the examinations that occurred prior to May 9, 2012. (*Id.* at ¶¶ 182-86) Because the continuing violation doctrine does not apply when a plaintiff is aware of his injury, *see Montanez*, 773 F.3d at 481, Vazquez has pled facts that would bar application of the continuing violation doctrine to these earlier events. Hence, although Vazquez's claims are not barred in whole, his claims based on events occurring prior to May 9, 2012 are barred by the statute of limitations.[11]

### h. Rogers

Rogers suffers from asthma, allergies, and headaches, and is designated as a chronic care inmate. (D.I. 20 at ¶ 188) He was transferred to SCI in June 2011. (*Id.*) Within the first two weeks of arriving at SCI, McDonald allegedly touched Rogers' genitals "under the guise of performing a physical examination." (*Id.* at ¶ 189) He alleges that he learned from other inmates that this was typical but inappropriate, and that he filed a grievance, about which he was told

---

[11]As noted, it is not clear which claims against which Defendants are based entirely on Plaintiffs' interactions with McDonald. By separate order, the parties will have an opportunity to advise the Court as to the impact of its conclusion here for each of Vazquez's claims against each Defendant.

"nothing was going to happen." (*Id.* at ¶ 190) He had further encounters with McDonald in "December 2011 or January 2012" and "February or March of 2012," during each of which McDonald again touched Rogers' genitals. (*Id.* at ¶ 191-92) On the third encounter, McDonald recommended a rectal exam, which Rogers declined. (*Id.* at ¶ 192) Rogers saw McDonald a fourth time, in June or July of 2012, and Rogers declined an exam of his genitals by McDonald on that occasion. (*Id.* at ¶ 193) The last time Rogers saw McDonald was between September and November 2012 for his physical, at which time McDonald again touched Rogers' genitals. (*Id.* at ¶ 195)

Rogers has pled at least some events that clearly fall within the statute of limitations period, including the last examination in September or November 2012. (*See id.*) Other claims, however, are not within the statute of limitations period. Rogers specifically has pled that he knew McDonald's exams were inappropriate and that he filed a grievance prior to May 9, 2012. (*Id.* at ¶ 190) Because he was aware of his injuries before May 9, 2012, the continuing violation doctrine does not apply. *See Montanez*, 773 F.3d at 481. Accordingly, although Rogers' claims are not barred in whole, his claims arising out of events before May 9, 2012 are barred by the statute of limitations.[12]

### i. Carrero

Carrero is a chronic care inmate at SCI due to type 2 diabetes. (D.I. 20 at ¶ 196) He began seeing McDonald in January 2011 and had to see McDonald every three months. (*Id.*) At

---

[12]As noted, it is not clear which claims against which Defendants are based entirely on Plaintiffs' interactions with McDonald. By separate order, the parties will have an opportunity to advise the Court as to the impact of its conclusion here for each of Rogers' claims against each Defendant.

21

Carrero's first visit, McDonald "squeeze[d] Carrero's breasts" and "fondled Carrero's testicles and penis," stating that he was searching for lumps. (*Id.* at ¶ 197) These examinations were allegedly repeated every time he saw McDonald; McDonald allegedly said that type 2 diabetics have erection problems. (*Id.* at ¶ 198) Carrero claims that when he stated he was uncomfortable with the nature of the examination, McDonald told him that he needed to cooperate. (*Id.* at ¶ 199) Carrero also claims that when he told correctional officers about his discomfort with the nature of the examinations, he was told "that McDonald [is] a doctor and 'kn[ows] what he [is] doing.'" (*Id.* at ¶ 200) Carrero claims that he refused these examinations and, as a result, McDonald took Carrero off his medication, resulting in a decline of Carrero's health, and he was only able to begin his medication regimen again once McDonald no longer worked at SCI. (*Id.* at ¶ 203) Carrero alleges that he wrote three grievances, none of which was addressed. (*Id.* at ¶ 202)

Taking all reasonable inferences in his favor, Carrero has pled some injury that occurred after May 9, 2012 and through the time of McDonald's departure from SCI in January 2013, namely his declining health due to refusing examinations and having medication removed. (*Id.* at ¶ 203) Carrero has pled that he was uncomfortable with the examinations, refused them, and eventually filed grievances, in spite of the fact that he was told that McDonald was a doctor and that the examinations were medically necessary. Carrero has pled that he had knowledge of injuries he sustained prior to McDonald's firing – but he has not pled that he had such knowledge prior to May 9, 2012. The Court does not conclude that a reasonable person would have had such knowledge prior to May 9, 2012. Therefore, the Court does not hold that Carrero's claims are barred by the statute of limitations.

### j.    Bramble

Bramble had chronic asthma and was "seen monthly by McDonald" between 2008 and January 2013 to receive care for the condition. (*Id.* at ¶ 204) He alleges that each time he visited McDonald, McDonald insisted on performing a complete checkup, including checking his testicles, and that there was no medical justification for this. (*Id.*) Bramble discovered other inmates had similar experiences and alleges that correctional officers were making jokes about McDonald's behavior. (*Id.* at ¶ 206) He did not tell correctional or medical staff about it because he believed they knew about it and would do nothing. (*Id.*) He alleges that on occasion he would see other doctors, none of whom asked to check his testicles. (*Id.* at ¶ 207)

Bramble has pled injury after May 9, 2012, as he alleges that he visited McDonald monthly until January 2013, and during each of these visits McDonald checked his testicles. (*See id.* at ¶ 204) At present, the Court cannot infer when Bramble became aware of his injury or when a reasonable person would have discovered the injury. Accordingly, dismissal of Bramble's claims based on the statute of limitations would be improper at the pleading stage.

### k.    Cox

Cox was treated as a chronic care patient approximately every 90 days between January 2009 and January 2013. (*Id.* at ¶ 217) During each visit, McDonald would allegedly check Cox for a "hernia," despite Cox telling him his hernia had been surgically repaired in 1998 and it not being necessary. (*Id.*) This procedure involved "Cox having to drop his pants and McDonald fondling his genitals for a 'hernia.'" (*Id.*) Cox's medical condition caused skin lesions on his face and arms, but not anywhere near his genitals; still McDonald allegedly continued to check Cox's genitals, claiming it was "'standard procedure' for him to check the genitals at each visit."

23

(*Id.* at ¶ 218)

Cox has pled some conduct that clearly falls within the statute of limitations, as he has pled events that occurred after May 9, 2012. (*See id.* at ¶ 217) With respect to the earlier events, the Court cannot hold at this stage that a reasonable person would have discovered that he was injured prior to May 9, 2012. McDonald told Cox that it was a standard procedure, and thus medically necessary, to perform these examinations. (*See id.* at ¶ 218) Accordingly, dismissal of Cox's claims based on the statute of limitations would be improper at this stage.

### l.    E. Garrison

E. Garrison was diagnosed with diabetes in 2006 and began to see McDonald for chronic care every 90 days thereafter. (*Id.* at ¶ 222) E. Garrison alleges that McDonald would check for testicular cancer and grab E. Garrison's penis during these chronic care checkups. (*Id.*) He also would allegedly perform rectal exams while the nurse was out of the room or on the other side of the curtain. (*Id.*) E. Garrison alleges that Hammond knew about these examinations and joked about how McDonald had been behaving inappropriately in examinations for years. (*Id.* at ¶ 223) He specifically remembers such statements being made on May 12 and May 13, 2014. (*Id.*)

It is not apparent from the face of the complaint that a reasonable person would have discovered E. Garrison's injuries prior to May 9, 2012. E. Garrison's allegations further suggest that, as a chronic care patient, he saw McDonald every 90 days, and, thus, he may have claims arising out of events occurring after May 9, 2012. Accordingly, dismissal of E. Garrison's claims based on the statute of limitations would be improper at this stage.

24

### m.    M. Garrison

M. Garrison was seen by McDonald from 2010 to 2012 every 60 to 90 days as a chronic care patient. (*Id.* at ¶ 225) These visits were "primarily to review his lab work to make sure that his liver function tests were not elevated." (*Id.*) He alleges that a nurse would be present at the start, but that McDonald would send the nurse out prior to conducting rectal exams or exams of his genitals. (*Id.*) M. Garrison alleges that Hammond told him "that he was going to see 'Dr. Feel Good' when he was going to see McDonald." (*Id.* at ¶ 226) He alleges that he initially trusted McDonald, but stopped doing so when he found out from another doctor at SCI that the genital and rectal exams were not necessary. (*Id.*)

M. Garrison has pled that he became aware that these examinations were not medically necessary – and, thus, that he was aware of his injury – at an unspecified time. (*Id.*) His allegations cover the period "[f]rom 2010 through 2012." (*Id.* at ¶ 225) Based on these allegations, it is plausible that M. Garrison saw McDonald after May 9, 2012 and, likewise, it is plausible that M. Garrison only first became aware that these examinations were not medically necessary sometime after May 9, 2012. The Court will not infer that a reasonable person would have known sooner. Taking all reasonable inferences in M. Garrison's favor, including that M. Garrison saw McDonald every 60 to 90 days through 2012, the statute of limitations defense is not apparent on the face of the complaint. Accordingly, dismissal based on the statute of limitations would be improper at this stage.

### n.    Hurst

Hurst met with McDonald multiple times in 2012 or early 2013 to review the results of his blood work. (*Id.* at ¶ 227) On one occasion, McDonald asked Hurst to pull down his pants,

25

and McDonald touched his genitals. (*Id.*) On another occasion, McDonald insisted on a rectal exam. (*Id.*) In neither case did Hurst believe there was a medical justification for those exams. (*Id.*)

Hurst has pled sexual assault by McDonald "in 2012 or early 2013." (*Id.*) Although he has pled that he did not believe there was a medical justification – and, thus, that he had knowledge of the injury he suffered – it is plausible based on the pleadings that his knowledge arose only after May 9, 2012. Further, it is plausible based on reasonable inferences in the Amended Complaint that he had encounters with McDonald after May 9, 2012. The Court will not infer that a reasonable person would have known of his injury sooner. Accordingly, dismissal based on the statute of limitations would be improper at this stage.

### o. Jolly

Jolly alleges that McDonald performed rectal exams on him "several years ago." (*Id.* at ¶ 230) He alleges that during one examination McDonald "ma[de] a 'weird sound like a moan,'" "grabbed [Jolly's] penis," and that McDonald's face was "near [Jolly's] penis" and McDonald "asked Jolly 'how's that feel?'" (*Id.*) After this, Jolly was hesitant to get treatment. (*Id.*) He alleges that prior to the last incident with McDonald, there was a nurse present whom McDonald asked to leave before the exam. (*Id.* at ¶ 233) He alleges that he heard comments about McDonald and "believes that everyone has known for years what McDonald was doing and it almost became an ongoing bad joke in the prison." (*Id.* at ¶ 232)

Jolly almost entirely fails to plead when the events giving rise to his claims occurred, which is unhelpful. *See generally Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("[A] civil rights complaint is adequate where it states the conduct, time, place, and persons

26

responsible."). However, taking all reasonable inferences in his favor, the appointments with McDonald that occurred "several years" before the 2014 filing of the Complaint may have occurred after May 9, 2012, and Jolly may not have been aware of the injurious nature of McDonald's conduct before May 9, 2012. Accordingly, the Court will not dismiss Jolly's claims based on the statute of limitations at this stage.

### p. Lewis

Between 2008 and 2012, Lewis regularly received medical care from McDonald for chronic conditions. (D.I. 20 at ¶ 234) He alleges that no matter what the reason for the visit, McDonald would make Lewis drop his pants and fondle his genitals for 10-15 seconds, asking Lewis how it felt, and on one occasion asking if Lewis liked it. (*Id.* at ¶ 235) Allegedly, McDonald would always send the nurse out before making Lewis drop his pants. (*Id.*) Lewis, like other Plaintiffs, alleges that he witnessed Hammond taunting inmates, and he believed "that everyone at SCI knew what was going on with McDonald but would not do anything about it." (*Id.* at ¶ 236) He alleges that when he tried to file a grievance, it was sent back as being about an issue that was non-grievable, like most grievances about staff members at SCI. (*Id.* at ¶ 237)

Although Lewis has not specifically pled any events after May 9, 2012, and although he has pled that he was aware at some point he had been injured, the Complaint does not clearly show that Lewis became aware of his injuries before May 9, 2012. Based on the period at issue in Lewis' allegations, the Court cannot say that Lewis' claims are barred at the pleading stage by the statute of limitations.

### q. Weldin

Weldin alleges that in August 2011 he was taken from his cell for a check-up with

27

McDonald. (*Id*. at ¶ 240) He alleges that he was "nervous because he had heard McDonald referred to as 'Dr. McGraby' or 'Dr. McFeely' from other inmates and staff." (*Id*.) He alleges that during his checkup, McDonald fondled him and made him cough several times. (*Id*.) He also alleges that he "wanted to refuse but feared being sprayed or beaten by correctional staff if he did" (*id*.), and that he "was under the care of mental health in August 2011, and in his mental state at the time he accepted what happened to him as being part of his punishment" (*id*. at ¶ 241).

Based on Weldin's allegations, the statute of limitations defense is apparent on the face of the complaint. He alleges only one examination with McDonald, in August 2011, and alleges that he knew of the improper nature of the examination and wanted to refuse at the time it occurred. Thus, the discovery rule does not save his otherwise untimely claim, because August 2011 is more than two years before the original complaint was filed. Accordingly, Weldin's claims based on this encounter will be dismissed.[13]

   **r.**  **Woolford**

Woolford alleges that during his time at SCI, McDonald made clear that Woolford was to see only him and no other provider. (*Id*. at ¶ 243) He alleges that he saw McDonald at least every 90 days for a chronic condition and, at each visit, McDonald "'check[ed] out' his genitals," without using gloves. (*Id*.) He alleges that he observed and experienced ridicule, and that correctional officers would pick out inmates and make jokes about McDonald's examinations of

---

[13]As noted, it is not clear which claims against which Defendants are based entirely on Plaintiffs' interactions with McDonald. By separate order, the parties will have an opportunity to advise the Court as to the impact of its conclusion here for each of Weldin's claims against each Defendant.

them. (*Id.* at ¶ 244)

Woolford almost entirely fails to plead when the facts giving rise to his claims occurred, which is unhelpful. However, it may be that he was at SCI and treated by McDonald at a time within the statute of limitations. Thus, the Court will not dismiss his claims at this stage based on the statute of limitations.

## C.     Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, "failure to exhaust is an affirmative defense to be pleaded by the defendant." *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion; that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Perfect overlap between the grievance and a complaint is not required, as long as there is

a shared factual basis between the two. *See Jackson v. Ivens*, 244 F. App'x 508, 513 (3d Cir. 2007) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.")).

Exhaustion of administrative remedies is raised as a defense to claims asserted by all Plaintiffs other than Barrett, whom the moving Defendants concede has sufficiently pled exhaustion and should withstand the motion to dismiss. (D.I. 25 at 10-12) The Court will not address exhaustion with respect to Plaintiffs whose claims are otherwise being dismissed. Therefore, the Court's discussion of exhaustion is limited to Plaintiffs Medley, Talmo, Brown, Jackson, Vincent, Vazquez, Rogers, Carrero, Bramble, Cox, E. Garrison, M. Garrison, Hurst, Jolly, Lewis, Woolford, and Fox (against whom no statute of limitations defense is alleged).

Although Talmo, M. Garrison, and Woolford present unique factual issues, the remainder of the Plaintiffs fall into two groups raising substantially similar factual and legal issues, at least at this stage. The members of the first group, consisting of Vazquez, Rogers, Carrero, Hurst, and Lewis, each allege that they filed a grievance against McDonald but that it was sent back as non-grievable or that no action was taken on their grievances. The members of the second group, consisting of Medley, Brown, Jackson, Vincent, Bramble, Cox, E. Garrison, Jolly, and Fox, each allege a fear of retaliation.

### 1.    Vazquez, Rogers, Carrero, Hurst, and Lewis

Vazquez, Rogers, Carrero, Hurst, and Lewis all generally allege that they filed grievances related to McDonald's examinations. (*Id.* at ¶¶ 186, 190, 202, 228, 237) Vazquez, Rogers, and Lewis allege that after they filed their grievances, they were told that the issues with McDonald could not be grieved. (*Id.* at ¶¶ 186, 190, 237) Carrero and Hurst allege that they filed

30

grievances but received no response. (*Id.* at ¶¶ 202, 228)

Availability of remedies, although ultimately a question of law, necessarily requires a factual inquiry. *See Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013). Each of these five Plaintiffs raises questions about the availability of the grievance process or whether the process has been complied with by SCI officials. "If prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are 'available' to him." *Abraham v. Costello*, 717 F. Supp. 2d 391, 395 (D. Del. 2010) (citing *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002)). Vazquez, Rogers, and Lewis all clearly pled that their attempts to use the grievance process were thwarted, which is sufficient to survive a motion to dismiss.

Carrero and Hurst, too, have pled facts sufficient to survive the motion to dismiss. The Third Circuit has recognized that filing a grievance and receiving no response may be sufficient to exhaust available remedies. *See Small*, 728 F.3d at 273. Such a failure to respond can be a thwarting of the grievance process, rendering the process unavailable. *See id.* Here, Carrero and Hurst have pled that they attempted to make use of the grievance process without receiving any response. Hence, Carrero and Hurst have pled sufficient facts to survive Defendants' motion to dismiss for failure to exhaust.

### 2. Medley, Brown, Jackson, Vincent, Bramble, Cox, E. Garrison, Jolly, and Fox

Medley, Brown, Jackson, Vincent, Bramble, Cox, E. Garrison, Jolly, and Fox pled that they feared retaliation if they filed a grievance against McDonald. (D.I. 20 at ¶¶ 120, 136, 172, 178, 208, 219, 224, 231 247) Plaintiffs also generally pled that grievances are leaked, leading to

31

harassment against those who file a grievance. (*Id.* at ¶ 56) Plaintiffs also generally pled that they have witnessed harassment and retaliation against inmates who complain about prison staff. (*Id.* at ¶ 68) Medley alleges that "[i]n his experience medical staff treated pain medication like it was a privilege and had reduced the pain medication he had been on for two years after he filed medical grievances requesting radiology studies on his neck." (*Id.* at ¶ 120(c)) Brown alleges that he "feared repercussion because he had heard that Defendant G.R. Johnson was romantically involved with a nurse at SCI who was usually present when McDonald was working." (*Id.* at ¶ 136) Jackson specifically alleges that he was aware of retaliation against other inmates. (*Id.* at ¶ 172) Bramble alleges that he had been retaliated against for a prior incident which led to a correctional officer being fired. (*Id.* at ¶ 209) Jolly alleges that he had once been moved to lockup for filing a grievance. (*Id.* at ¶ 231) Fox alleges that he had been beaten by an officer for no reason, which caused his fear of retaliation. (*Id.* at ¶¶ 245, 247)

The Third Circuit has never squarely addressed in a precedential opinion whether fear of retaliation for pursuing a grievance excuses failure to exhaust. In a non-precedential opinion, the Third Circuit vacated a district court's dismissal of such a case. *See Verbanik v. Harlow*, 441 F. App'x 931, 933 (3d Cir. 2011). Arguably contrary non-precedential opinions, however, indicate that fear of retaliation does not excuse failure to exhaust. *See Pena-Ruiz v. Solorzano*, 281 F. App'x 110, 112 (3d Cir. 2008). At this point, the Court will not hold that fear of retaliation is not a valid excuse for failure to exhaust administrative remedies.

To the extent that Defendants are arguing that actual retaliation following filing a grievance is necessary, rather than simply a legitimate fear of retaliation that deters filing of a grievance (*see* Tr. at 24-25), the Court is unpersuaded. As the Third Circuit stated in *Verbanik*,

"[o]ther courts of appeals have concluded that retaliation or threats of retaliation against an inmate for pursuing a grievance may make administrative remedies unavailable to the inmate." 441 F. App'x at 933 (citing *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008); *Kaba v. Stepp*, 458 F.3d 678, 684-86 (7th Cir. 2006); *Hemphill v. New York*, 380 F.3d 680, 686-87 (2d Cir. 2004)); *see also Tuckel v. Grover*, 660 F.3d 1249, 1252-53 (11th Cir. 2011). Thus, threats of retaliation, and not just actual retaliation, may be sufficient to excuse exhaustion.

Each member of this group of Plaintiffs alleges that his fear of retaliation was the reason he did not file a grievance against McDonald. Although the Amended Complaint is lacking in details about precisely what each Plaintiff knew, it alleges that inmates were generally aware of retaliation against those who filed grievances. (D.I. 20 at ¶¶ 56, 68) The pleadings provide sufficient facts supporting a fear of retaliation to survive dismissal at this stage. There are enough facts alleged to suggest that "a 'similarly situated individual of ordinary firmness' would have deemed the grievance procedures [not] to be available." *Verbanik*, 441 F. App'x at 933 (quoting *Hemphill*, 380 F.3d at 688). Likewise, the facts alleged are sufficient at this stage to show that the fear of retaliation actually did deter these plaintiffs from filing a grievance. *See Tuckel*, 660 F.3d at 1254. Thus, Plaintiffs have pled facts that satisfy the tests that have been stated for whether retaliation renders administrative remedies unavailable.

### 3. Talmo

Talmo alleges that he initially did not report McDonald because he was afraid his pain medication would be taken away as a retaliatory punishment. (D.I. 20 at ¶ 130) However, he eventually spoke to a nurse about the sexual assaults, as well as to a member of the mental health

staff.  (*Id.*)  He alleges that no action was taken in response to these reports.  (*Id.*)[14]

Talmo pleads seemingly inconsistent facts related to his failure to exhaust.  On the one hand, he alleges that he did not file a grievance due to fear of retaliation, but on the other hand he alleges that he reported McDonald to SCI medical staff.  (*Id.* at ¶ 130)  His allegations of fear of retaliation appear to be contradicted by his allegations that he ultimately made complaints about McDonald.

Two tests are potentially applicable to determining whether Talmo's fear of retaliation is sufficient to render administrative remedies unavailable.  The Second and Seventh Circuits have relied on the test set out in *Hemphill*, an objective inquiry asking whether "the threat or intimidation would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance." *Tuckel*, 660 F.3d at 1254; *see also Kaba*, 458 F.3d at 684; *Hemphill*, 380 F.3d at 688.  The Tenth and Eleventh Circuits have utilized a two-part test.  Under this test, finding that fear of retaliation excuses failure to exhaust administrative remedies requires satisfying the objective test from *Hemphill*, and further showing "that the threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process." *Tuckel*, 660 F.3d at 1254; *see also Turner*, 541 F.3d at 1085.

Here, although Talmo alleges that he had an objective fear of retaliation, he specifically pleads that he was not deterred from making complaints, albeit his complaints were made outside of the formal grievance process.  (D.I. 20 at ¶ 130)  Thus, if only the objective inquiry applied, Talmo might be excused from properly exhausting the grievance process, due to an objective reason to fear retaliation.  However, applying the standard from the Tenth and Eleventh Circuits,

---

[14]Talmo also alleges that he has a fear of retaliation for joining this lawsuit.  (*Id.* at ¶ 132)

34

Talmo's claims might be barred for failure to exhaust his remedies, as Talmo was not subjectively deterred from complaining about McDonald's conduct. (*Id.*; *see also Tuckel*, 660 F.3d at 1254) Under the circumstances, recognizing that the Court cannot make factual determinations at this stage, and given the unsettled nature of the law, the Court will not dismiss Talmo's claims for failure to exhaust administrative remedies.

### 4. M. Garrison and Woolford

M. Garrison and Woolford allege no specific facts related to exhaustion of administrative remedies or a reason for why they failed to do so. (D.I. 20 at ¶¶ 225-26) Ultimately, as the Supreme Court has recognized, failure to exhaust is an affirmative defense, and a plaintiff is not required to specially plead or demonstrate exhaustion in his or her complaint. *See Jones*, 549 U.S. at 219. Exhaustion of remedies is a factual inquiry, and it is Defendants' burden to prove failure to exhaust. *Small*, 728 F.3d at 271. There is no basis to find at this stage that M. Garrison's or Woolford's claims are barred for failure to exhaust and, accordingly, they will not be dismissed on this basis.

### D. Lack of Personal Involvement by State Defendants

The State Defendants argue that Plaintiffs have failed to allege the necessary personal involvement required to state a claim under 42 U.S.C. § 1983. (D.I. 25 at 13-17) "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal citations omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate

particularity." *Id.* (internal citations omitted).

The Third Circuit has established a four-part test for determining supervisor liability for

an Eighth Amendment violation based on deliberate indifference:

> To hold a supervisor liable for such an Eighth Amendment
> violation, the plaintiff must identify a supervisory policy or
> procedure that the supervisor defendant failed to implement,
> and prove that: (1) the policy or procedures in effect at the time
> of the alleged injury created an unreasonable risk of a constitutional
> violation; (2) the defendant-official was aware that the policy
> created an unreasonable risk; (3) the defendant was indifferent
> to that risk; and (4) the constitutional injury was caused by the
> failure to implement the supervisory procedure.

*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 330 (3d Cir. 2014) (internal citation omitted),

*vacated on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042 (2015). Alternatively, "a

supervisor may be personally liable under § 1983 if he or she participated in violating the

plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of

and acquiesced in the subordinate's unconstitutional conduct." *Id.* (internal quotation marks and

citation omitted).[15]

Defendant Johnson is alleged to have been the warden, deputy warden, security

superintendent, a captain, or a staff lieutenant at all pertinent times. (D.I. 20 at ¶ 38) It is alleged

that as warden, deputy warden, or security superintendent, "[a]ll grievances at some point in the

process would come to him" and "[h]e would have known from these grievances that allegations

were being made that McDonald was sexually assaulting inmates." (*Id.*) It is further alleged that

---

[15]Defendants contended at oral argument that the Supreme Court's decision in *Iqbal*
ended supervisory liability for an Eighth Amendment deliberate indifference claim. However,
the Third Circuit addressed this issue in *Barkes* and concluded that its previous jurisprudence
survived *Iqbal*. *See generally Barkes*, 766 F.3d at 316-25.

36

he also had to attend the special needs unit meeting every Wednesday while he was the warden, and "[i]t is likely that at some of these meetings the accusations against McDonald would have been discussed." (*Id.*)

Defendant Valentino is alleged to have been a major, security superintendent, or deputy warden, and further that most grievances at some point during the process would come to her in those roles. (*Id.* at ¶ 39)

There are no such allegations about Defendant Hammond having a supervisory role. It is alleged only that he was a correctional officer. (*Id.* at ¶ 42)

It is further alleged that for six years, Defendants Johnson and Valentino "ignored or denied and suppressed complaints about McDonald." (*Id.* at ¶ 69) This period includes prior litigation in this Court against McDonald (though not against any of the other named State Defendants).[16] (*Id.*; *see also id.* at ¶¶ 70-81 (describing prior litigation))[17] It is alleged that despite these accusations, in 2006, Johnson and Valentino "took no precautionary steps to prevent sexual abuse of inmates by a doctor in McDonald's position of power over inmates."

---

[16]Plaintiffs also include allegations related to abuse at other prisons or by other physicians in Delaware, none of which involve McDonald, Johnson, or Valentino. (D.I. 20 at ¶¶ 53-89) This is alleged to be a part of an "ongoing history" by the Department of Corrections to "fail[] to investigate and take action when inmates suffer sexual abuse at the hands of DOC staff and medical staff." (*Id.* at ¶ 90)

[17]In this prior suit, this Court granted summary judgment to McDonald on the section 1983 claims, a decision later affirmed by the Third Circuit. *See generally Roten v. McDonald*, 2009 WL 4348367 (D. Del. Nov. 30, 2009), *aff'd*, 394 F. App'x 836 (3d Cir. 2010). These decisions were based at least in part based on the Courts' understanding that "the SCI inmates' allegations of sexual misconduct were investigated by DOC Internal Affairs, reviewed by the Medical Society of Delaware, and determined to be 'unfounded,'" *Roten*, 394 F. App'x at 840, although Plaintiffs now allege that "[r]ecently the Delaware Board of Medical Practice issued a statement in which the Board denied ever receiving or investigating a complaint about McDonald" (D.I. 20 at ¶ 79).

(*Id.* at ¶ 82) Plaintiffs allege that Johnson and Valentino were involved in a "cover up of the abuse" by McDonald. (*Id.* at ¶ 90) With respect to Hammond, there are numerous allegations of his awareness of McDonald's abuses based on conversations with Plaintiffs. (*E.g.*, *id.* at ¶¶ 113, 126, 182)

Given all of these allegations, the Court concludes that Plaintiffs have failed to adequately allege facts sufficient to hold Hammond liable under § 1983 for McDonald's alleged abuse, because there are no allegations of Hammond's personal involvement or supervisory role. There are numerous allegations of Hammond's awareness of the alleged abuses, but this is insufficient to plead personal involvement. *See Barkes*, 766 F.3d at 330.[18] Accordingly, the allegations against Hammond fail to state a claim on which relief can be granted under 42 U.S.C. § 1983.

With respect to Johnson and Valentino, Plaintiffs essentially concede that there are no allegations of actual knowledge by either supervisor. (D.I. 28 at 15) Instead, Plaintiffs argue that "[d]espite their attempts to behave as ostriches, it is reasonable to assume these complaints reached Johnson and Valentino." (*Id.*) Plaintiffs' primary argument is that "it is hard to imagine that all of the talk about McDonald went on for years yet the warden and deputy warden knew nothing about it." (*Id.*) However, as the Third Circuit explained in *Barkes*, 766 F.3d at 322-23, the subjective knowledge of the supervisor is a critical factor, although it is one that may typically be provable only by circumstantial evidence.

The Court concludes that Plaintiffs have not sufficiently pled facts to support a plausible

_____

[18]Plaintiffs conceded at oral argument that Hammond had no supervisory role, and could only articulate that he was liable for failure to report, an argument that they had not raised in the briefing. (Tr. at 40)

allegation that Johnson or Valentino had actual knowledge of McDonald's alleged abuses. The prior litigation cited by Plaintiffs did not name Johnson or Valentino, and it is not alleged that Johnson or Valentino ever saw any of the grievances that were filed until after Barrett's grievance was successful and McDonald was fired. (*See* D.I. 20 at ¶ 100) It is not alleged that any complaints about McDonald actually reached Valentino and Johnson, merely that it is reasonable to believe that they would have been aware of such complaints.

Without further factual allegations, Plaintiff's complaint "stops short of the line between possibility and plausibility" with respect to Johnson and Valentino's personal involvement. *Twombly*, 550 U.S. at 557. Accordingly, the allegations against Johnson and Valentino fail to state a claim upon which relief can be granted under § 1983.

### E.     Immunity for State Defendants Under Delaware's Tort Claims Act

The State Defendants argue that Plaintiffs have failed to plead sufficient facts to overcome the immunity provided under Delaware's Tort Claims Act for the negligent supervision claims against Johnson and Valentino. Under Delaware's Tort Claims Act, there can be no claim for relief where the act was done without gross or wanton negligence. *See* 10 Del. C. § 4001(3). "Gross negligence is a higher level of negligence representing an extreme departure from the ordinary standard of care." *Browne v. Robb*, 583 A.2d 949 (Del. 1990) (internal quotation marks omitted). The Delaware Supreme Court has called gross negligence the "functional equivalent" of criminal negligence. *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987); *see also Morales v. Family Founds. Acad., Inc. Sch.*, 2013 WL 3337798, at *2 (Del. Super. Ct. June 11, 2013). "Gross negligence exists when 'a person fails to perceive a risk of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard

of conduct that a reasonable person would observe in the situation.'" *Id.* (quoting 11 Del. C. §

231(a)). "For [a] defendant's conduct to be found wilful or wanton the conduct must reflect a

'conscious indifference' or 'I don't care' attitude." *Cloroben Chem. Corp. v. Comegys*, 464 A.2d

887, 891 (Del. 1983). Generally, the issue of whether facts and circumstances amount to willful

conduct or gross negligence is a question for the finder of fact. *See Eustice v. Rupert*, 460 A.2d

507, 509 (Del. 1983). Nevertheless, "[i]t is a matter of law when the conduct in question falls

short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find

gross negligence." *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co., Inc.*,

2005 WL 445710, at *4 (Del. Super. Ct. Feb. 23, 2005) (internal quotation marks omitted).

Based on the factual allegations, the Court cannot dismiss the negligent supervision

claims against Johnson or Valentino.[19] Unlike a § 1983 claim for deliberate indifference to

medical needs, which requires actual awareness of a risk, gross negligence can arise due to a

failure to perceive a risk of such a nature and degree that failure to perceive it constitutes a gross

deviation from the standard of conduct that a reasonable person would observe in the situation.

The facts alleged against Johnson and Valentino could support gross negligence, as they

plausibly suggest that Johnson and Valentino – by failing to become aware of McDonald's

abuses and failing to remove him – were negligent in their oversight of McDonald. (*See* D.I. 20

at ¶¶ 271, 279)

Accordingly, the negligent supervision claims against Johnson and Valentino will not be

---

[19]Plaintiffs do not assert a claim for negligent supervision against Hammond, only claims
for negligent and intentional infliction emotional distress. (D.I. 61 at 2; D.I. 62 at 2) No party
addressed the emotional distress claims against Hammond in the briefing and the Court will not
do so here.

dismissed based on Delaware's Tort Claims Act.

## F.     Conspiracy by State Defendants

Johnson and Valentino allege that Plaintiffs have failed to adequately plead a civil conspiracy claim under Delaware law.[20]  (D.I. 25 at 19-20)  Although the State Defendants focus on civil conspiracy under state law, Plaintiffs indicated (after the briefing) that their claim for a conspiracy arises under 42 U.S.C. § 1985(3).  (D.I. 61 at 2; D.I. 62 at 2)  Despite the differing requirements for civil conspiracy under Delaware law and a civil rights conspiracy under § 1985, there is significant overlap between the elements of the two claims. Namely, both claims require that there be: (1) a conspiracy, that is, an agreement to commit an unlawful act; (2) an act in furtherance of the conspiracy; and (3) damages resulting from the conspiracy.  *Compare Fabber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (§ 1985(3) conspiracy) *with AeroGlobal Capital Mgmt., LLC. v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005) (civil conspiracy).[21]  Thus, because certain of the State Defendants' arguments apply equally to a § 1985(3) conspiracy, the Court will address them here.

Under Third Circuit precedent, "the allegations of conspiracy must be grounded firmly in facts; they cannot be conclusory nor can they hinge on bare suspicions and foundationless speculation." *Simonton v. Tennis*, 437 F. App'x 60, 63 (3d Cir. 2011) (citing *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991)).  Here, Plaintiffs' allegations of an agreement are

---

[20]Plaintiffs do not respond to this argument in opposition to the State Defendants' motion to dismiss.  (*See generally* D.I. 28)

[21]Unlike a civil conspiracy under Delaware law, a civil rights conspiracy under § 1985(3) must be "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Fabber*, 440 F.3d at 134 (quoting § 1985(3)).

41

conclusory and based on foundationless speculation. Plaintiffs allege that Mosser, Johnson, and

Valentino "ignored or denied and suppressed complaints about McDonald" for six years. (D.I.

20 at ¶ 69) They essentially plead parallel wrongdoing by Mosser, Johnson, and Valentino, but

do not plausibly allege an agreement among them and McDonald. (*Id.* at ¶¶ 254-58, 267-85)

There are no allegations relating to Johnson and Valentino's wrongdoing except that their roles

gave them responsibility over the grievance process and over McDonald. (*Id.* at ¶¶ 267-85)

These allegations are inadequate. *Accord Twombly*, 550 U.S. at 556-57 (explaining, in context of

Sherman Act, that "when allegations of parallel conduct are set out . . . , they must be placed in a

context that raises a suggestion of a preceding agreement, not merely parallel conduct that could

just as well be independent action").

Accordingly, Plaintiffs have failed to state a claim for a § 1985(3) conspiracy by Johnson

and Valentino.

### G. Conspiracy by Connections Defendants

The Connections Defendants argue that Plaintiffs have failed to adequately plead a

conspiracy between Fabber and other Defendants. (D.I. 45 at ¶¶ 18-21) Although this claim was

included in the Amended Complaint (D.I. 20 at ¶ 318), Plaintiffs did not include it in their chart

of claims (D.I. 61 at 2), and counsel for Plaintiffs confirmed at oral argument it was being

withdrawn, as it was apparently added to the Amended Complaint by mistake (Tr. at 63).

Accordingly, the Court will dismiss the conspiracy claim against Fabber and Connections.

### H. First Amendment Retaliation by the Connections Defendants

The Connections Defendants also argue that Plaintiffs Schultz and Jackson fail to state a

retaliation claim against Fabber. (D.I. 45 at ¶¶ 23-25) The alleged retaliation by Fabber is a

42

single instance of verbal harassment, during which another Defendant was harassing two

Plaintiffs about the lawsuit. (D.I. 20 at ¶¶ 143-44) Fabber allegedly

> joined in the discussion . . . [and] made much of the fact that he
> needed soap to wash his hands. After washing his hands, he stuck
> out his pointer and middle fingers on one hand and started
> thrusting them back and forth in the air as though to simulate one
> of the rectal exams performed by McDonald.

(*Id.* at ¶ 145)

In order to prove a retaliation claim under the First Amendment, a plaintiff must show,

*inter alia*, that a defendant's actions were sufficiently adverse to deter a person of ordinary

firmness from engaging in the protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.

2001). As the Third Circuit has recognized, "verbal threats and [a] few gestures of . . .

harassment" are not sufficiently adverse to support a retaliation claim. *Dunbar v. Barone*, 487 F.

App'x 721, 723 (3d Cir. 2012); *see also Miller v. Coning*, 2014 WL 808023, at *13 (D. Del. Feb.

28, 2014) (citing cases), *report and recommendation adopted*, 2014 WL 3896605 (Aug. 7, 2014).

All that Plaintiffs have alleged is verbal harassment by Fabber, which here is not sufficiently

adverse to deter a person of ordinary firmness from exercising his constitutional rights.

Accordingly, Plaintiffs' § 1983 claim for retaliation against the Connections Defendants

will be dismissed.[22]

## I.    Claims for Emotional Distress against Connections Defendants

In their answering brief, Plaintiffs argued that they had stated a claim for intentional

infliction of emotional distress. The Connections Defendants had not challenged this claim in

---

[22]Because the Court has dismissed the federal claims against the Connections Defendants, the Court need not address their argument that they did not act under color of state law.

their opening brief, and only first addressed it in their reply brief. Although ordinarily the Court

does not consider arguments first raised in a reply brief, *see Leeseberg v. Converted Organics*

*Inc.*, 2010 WL 4878380, at *2 n.2 (D. Del. Nov. 22, 2010); D. Del. LR 7.1.3(c)(2), the

Connections Defendants assert that they were not on notice of this claim until after Plaintiffs

responded to their motion. Because this issue was ultimately raised and argued by both the

Connections Defendants and Plaintiffs, the Court will – in the interests of judicial economy –

address it.

Under Delaware law, a claim for intentional infliction of emotional distress arises when

"[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe

emotional distress to another." *Fanean v. Rite Aid Corp. of Del., Inc.*, 984 A.2d 812, 817 (Del.

Super. 2009) (quoting Restatement (Second) of Torts § 46). The Amended Complaint fails to

allege that Schultz or Jackson suffered any emotional distress due to Fabber's actions, let alone

emotional distress that was so severe as to be extreme or outrageous. (*See* D.I. 20 at ¶¶ 145-49)

Accordingly, Plaintiffs have failed to state a claim for intentional infliction of emotional distress.

*See Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1024 (D. Del. 2011).

Plaintiffs have also failed to plead a claim for negligent infliction of emotional distress

against the Connections Defendants. Under Delaware law, a claim for negligent infliction of

emotional distress requires: "(1) negligent conduct that proximately causes emotional distress;

and (2) the emotional distress is accompanied by non-transitory, recurring physical phenomena."

*Greene v. U.S. Postal Serv.*, 462 F. Supp. 2d 578, 580 (D. Del. 2006) (citing *Lupo v. Med. Ctr. of*

*Del., Inc.*, 1996 WL 111132, at *3 (Del. Super. Feb. 7, 1996)). Plaintiffs have failed to plead any

physical injury to Schultz or Jackson that resulted from Fabber's actions. (*See* D.I. 20 at ¶¶ 143-

48)[23]

Accordingly, Plaintiffs have failed to plead a claim of intentional or negligent infliction of emotional distress.

## V.    CONCLUSION

For the foregoing reasons, the State Defendants' and the CCS Defendants' motions to dismiss will be granted in part and denied in part, and the Connections Defendants' motion for judgment on the pleadings will be granted.  An appropriate Order follows.

---

[23]Plaintiffs have also admitted that they did not specifically plead *negligent* infliction of emotional distress, but argued that this claim was implicitly included in the Complaint under a theory akin to a "lesser included offense" in criminal law.  (Tr. at 62)